1
2
3
4
5
6
7
8
9

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ROBERT C. GOMEZ, | CASE NO. CV-F-04-6544 LJO |
| Plaintiff, | **DECISION ON SOCIAL SECURITY COMPLAINT** (Docs. 8, 11, 12.) |
| vs. | |
| JO ANNE B. BARNHART, Commissioner of Social Security, | |
| Defendant. | |

## **INTRODUCTION**

Plaintiff Robert Gomez ("plaintiff") seeks this Court's review of an administrative law judge's ("ALJ's") decision that plaintiff was not disabled during June 13, 1980 to September 30, 1985 and was not entitled during that adjudicated period to disability insurance benefits under Title II of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433.  Pursuant to 28 U.S.C. § 636(c) and F.R.Civ.P. 73, the parties agreed to proceed before a United States Magistrate Judge, and by an April 19, 2005 order, this action was assigned to United States Magistrate Judge Lawrence J. O'Neill for all proceedings.  Based on review of the Administrative Record ("AR") and the papers of plaintiff and defendant Jo Anne B. Barnhart, Commissioner of Social Security ("Commissioner"), this Court DENIES plaintiff's request to award plaintiff benefits and to reverse the Commissioner's decision.

1

## BACKGROUND

### Plaintiff's Personal Background

Plaintiff was born April 25, 1948 and was age 32 on June 13, 1980 when he alleges he became disabled.  (AR 27, 102, 245.)  Plaintiff has a seventh or eighth grade education comprising special education classes.  (AR 27, 253.)  Plaintiff served two years in the U.S. Army as a cook, and he has past relevant work as a farm laborer, janitor, furniture deliverer, and bundle handler in a clothing factory. (AR 27, 245, 253, 257-262, 1086.)

### Administrative Proceedings

On March 24, 1981, plaintiff filed his original application for disability insurance benefits to claim disability since June 13, 1980 from right arm bursitis.  (AR 245.)  In his March 24, 1981 disability report, plaintiff noted his inability to "pick up" is right arm to perform his bundle handler work.  (AR 249.)  Plaintiff noted that his arm started hurting on Friday June 13, 1980 and that pain prevented him to work on Monday June 16, 1980.  (AR 253.)  Plaintiff further noted that he cooked twice a week and "did some driving[] [m]ostly when I have to go to doctors."  (AR 252.)  A Social Security Administration ("SSA") employee attributed plaintiff to state that plaintiff could not read and observed that plaintiff's wife read an application to plaintiff and had filled out an SSA form.  (AR 256.)  The SSA employee further observed that plaintiff's arm was in a sling and that plaintiff "winced with pain on occasion."  (AR 256.)

On June 4, 1981, SSA denied plaintiff's claim and noted a normal nerve conduction study of plaintiff's right arm, negative right shoulder x-rays, absence of evidence of irreversible organ damage from diabetes, and absence of severe depression symptoms.  (AR 267.)  SSA concluded that plaintiff "has the capacity for his usual work."  (AR 267.)

On June 28, 1981, plaintiff filed his Request for Reconsideration to claim he is disabled.  (AR 268.)  Plaintiff completed a June 29, 1981 Reconsideration Disability Report to claim inability to lift his right arm and "heavy things."  (AR 269.)  An SSA employee noted that plaintiff asked "to explain questions frequently" and that plaintiff held his right hand except to sign his name.  (AR 273; underlining in original.)  On August 12, 1981, SSA denied plaintiff's claim and noted negative x-rays of plaintiff's right shoulder, a normal electromylogram of plaintiff's right upper extremity, and absence

of significant diabetic end organ damage and severe depression symptoms.  (AR 276, 279.)  SSA determined that although plaintiff was unable to perform his past bundle handler work, he was able to perform jobs existing in significant numbers in the regional economy and including gate man, assembler press operator and power press tender.  (AR 276.)

On October 9, 1981, plaintiff filed his Request for Hearing to note that the employment office and handicap center had turned him down for work and that he experienced increased nervousness and irritability and worsened diabetes.  (AR 280, 281.)  A July 30, 1982 ALJ decision found that plaintiff was not disabled and not entitled to disability insurance benefits.  (AR 372.)  The ALJ noted that plaintiff's "complaints of chronic and severe incapacitating subjective pain are not found to be credible in view of the overall evidence of record."  (AR 371.)

Plaintiff submitted to SSA's Appeals Council his August 4, 1982 Request for Review of Hearing Decision/Order to appeal the ALJ's July 30, 1982 decision and to claim continuing disability from inability to use his right arm.  (AR 374.)  On November 16, 1982, the Appeals Council denied plaintiff's request for review, and plaintiff did not seek this Court's further review.  (AR 26, 275.)

In August 1982, plaintiff filed an application for disability insurance benefits (AR 765), but that application is not in the record.  On September 23, 1987, plaintiff protectively filed his application for Supplemental Security Income ("SSI") to claim disability since June 13, 1980 due to pinched nerve and diabetes.  (AR 382, 391.)  On January 21, 1988, SSA found plaintiff disabled as of September 1, 1987 based on a primary diagnosis of dysphoric disorder.  (AR 400.)

On September 30, 1987, plaintiff protectively filed his an application for disability insurance benefits to claim disability since June 13, 1980 due to pinched nerve in right arm and diabetes.  (AR 377.)  With its January 21, 1988 Notice of Disapproved Claim, SSA determined plaintiff is not entitled to disability benefits based on an absence of "medical evidence which shows that [plaintiff's] condition prevented [him] from working on or before 9/30/85," the last day on which plaintiff met the earnings requirement for benefits.  (AR 395-397.)  Plaintiff did not seek further review of SSA's denial of his claim for disability insurance benefits.

On March 12, 1993, March 14, 1994, October 14, 1994 and July 6, 1995, plaintiff filed applications for disability benefits to claim disability since June 13, 1980.  (AR 401, 407, 411, 415.)

3

SSA denied plaintiff's March 12, 1993, March 14, 1994 and October 14, 1994 applications initially and on reconsideration, and plaintiff did not seek further SSA review. (AR 757.) SSA's determinations on those applications are not in the record. (AR 26.) SSA also denied initially and on reconsideration plaintiff's July 6, 1995 application, and plaintiff filed a November 3, 1995 request for an ALJ hearing to review the denial. (AR 63, 757.) With his September 6, 1996 order, the ALJ found that final determination made on plaintiff's October 8, 1987 application "may not be reopened, and it is considered a final and binding determination of the Administration." (AR 758.) The ALJ further found that plaintiff's hearing request involved "the rights of the same claimant on the same facts and on the same issues" which were decided in SSA's prior final and binding determinations on plaintiff's claims for disability insurance benefits. (AR 758.) Thus, the ALJ dismissed plaintiff's ALJ hearing request. (AR 758-759.)

Plaintiff sought review of the ALJ's dismissal. (AR 762.) With its May 20, 1998 order, SSA's Appeals Council noted that SSA's Notice of Disapproved Claims contained "defective" language regarding appeal rights. (AR 27, 765.) The Appeals Council vacated the ALJ's September 6, 1996 dismissal order and remanded plaintiff's case for a hearing, further action to complete the administrative record, and an ALJ decision. (AR 766.)

Upon remand, the ALJ conducted a July 30, 1998 hearing. (AR 68.) With his September 18, 1998 decision, the ALJ noted that the "primary issue" is whether plaintiff was disabled prior to September 30, 1985, the date he was last insured for disability insurance benefits. (AR 998.) The ALJ found plaintiff's subjective complaints not to be credible to the degree alleged for the period at issue and that prior to his date last insured, plaintiff was capable to engage in his past janitor work. (AR 1003, 1004.)

Plaintiff submitted to the Appeals Council his October 16, 1998 request to review the ALJ's September 18, 1998 decision in that the ALJ incorrectly characterized plaintiff's past janitor work as light, not medium to heavy. (AR 1005, 1007.) Plaintiff requested an additional hearing to determine his appropriate work level. (AR 1007.) With its March 22, 2000 order, the Appeals Council granted plaintiff's request and found plaintiff was entitled to a new determination on the merits of his August 1982 application for disability insurance benefits. (AR 1010.) The Appeals Council ordered the ALJ

on remand to evaluate plaintiff's impairments, to determine whether plaintiff was under a disability beginning June 13, 1980, the alleged onset date, and to further consider whether plaintiff is able to perform is past relevant work.  (AR 1010.)

The ALJ conducted March 26, 2001 and June 15, 2001 de novo hearings on plaintiff's August 1982 application, and plaintiff, a medical expert and a vocational expert testified at the hearings.  (AR 97, 133.)  The ALJ issued his July 18, 2001 decision to identify as a critical issue whether plaintiff experienced a disabling impairment or combination of impairments no later than September 30, 1985, when his insured status expired.  (AR 1065.)  The ALJ concluded "that the medical evidence fails to corroborate during the period adjudicated the claimant's self-reported limitations and that his prior testimony reflected exaggerated inability cannot withstand close scrutiny."  (AR 1073.)  The ALJ found "there were a significant number of jobs in the economy which the claimant could have performed" during the period at issue to render plaintiff not disabled during that period.  (AR 1074, 1075.)

By an August 22, 2001 letter, plaintiff requested the Appeals Council to review the July 18, 2001 ALJ decision.  (AR 1077.)  With its March 26, 2003 order, the Appeals Council granted plaintiff's review request, vacated the July 18, 2001 ALJ decision, and remanded plaintiff's case "for further proceedings on the issue of disability prior to September 1, 1987."  The Appeals Council directed the ALJ to consider the opinions of treating, consultative and private examining psychiatrists, to further evaluate plaintiff's subjective complaints, to obtain evidence from a medical expert (psychological if available) to clarify the nature and severity of plaintiff's impairments and to help resolve discrepancy in the medical opinions, to further consider plaintiff's maximum residual functional capacity, and if warranted, to obtain supplemental evidence from a vocational expert.  (AR 1082-1083.)

The ALJ conducted a further September 8, 2003 hearing at which plaintiff and medical and vocational experts testified.  (AR 174, 1087.)  Plaintiff submitted to the ALJ a letter brief to contend that plaintiff "should be found disabled as of May 18, 1981 – the approximate date on which Mr. Gomez first became unable to work due to a combination of his Reflex Sympathetic Dystrophy ("RSD"), depression and preexisting low mental function."  (AR 1130.)  The ALJ issued his October 29, 2003 decision to conclude that during the period at issue, plaintiff retained the residual functional capacity to perform a full range of light or sedentary work, was not disabled, and thus was not entitled to benefits.  (AR 37.)

On November 13, 2003, plaintiff submitted to the Appeals Council his Request for Review of Hearing Decision/Order to appeal the ALJ's October 29, 2003 decision. (AR 19.) On September 17, 2004, the Appeals Council denied plaintiff's request for review to render the October 29, 2003 ALJ decision as the Commissioner's final decision subject to this Court's review. (AR 10.)

**Medical History And Records Review**

***Tulare County Department Of Health Services***

Plaintiff received treatment through the Tulare County Department of Health Services, including at the Hillman Health Care Center. July 11, 1980 notes reflect plaintiff received cortisone injections in and ultrasound treatment to his right shoulder "with no great benefit." (AR 655.) On July 31, 1980, plaintiff's shoulder was tender to touch. (AR 644.) On August 5, 1980, plaintiff complained of feeling worse than prior to an injection a week prior. (AR 645.) Plaintiff complained of right arm pain and numbness. (AR 645.) A treating physician attributed plaintiff's condition to a possible "mechanical problem." (AR 645.) An August 12, 1980 electromyogram of plaintiff's right arm was normal. (AR 654.) September 10, 1980 notes attribute a physical therapist to report that plaintiff complained of less pain, had increased range of motion, and was "functionally" better. (AR 647.)

February 6, 1981 right shoulder x-rays were negative and unremarkable. (AR 650, 652.) February 18, 1981 notes reflect that plaintiff was unwilling to move the right shoulder much and had not responded to measures, including injections. (AR 650.)

September 2, 1982 notes reflect that plaintiff was assessed with diabetes mellitus, uncontrolled and hypertension under control. (AR 598.) On September 9, 1982, plaintiff felt better as to his diabetes. (AR 598.) On September 17, 1982, plaintiff noted that he felt better. (AR 596.) In October and November 1982, plaintiff was assessed with diabetes mellitus out of control. (AR 593-595.)

On January 20, 1983, plaintiff stated he felt better and was assessed with diabetes, not well controlled. (AR 590.) According to March 7, 1983 notes, plaintiff felt "tired and sleepy after work" and was diagnosed with diabetes mellitus uncontrolled. (AR 588.) Later in March 1983, plaintiff was hospitalized for his diabetes and was diagnosed with diabetes mellitus, uncontrolled. (AR 642, 643.) Plaintiff was placed on a 1,000-calorie diet and insulin. (AR 643.) On March 23, 1983, plaintiff was assessed with diabetes mellitus, uncontrolled. (AR 587.) On April 6, 1983, plaintiff was assessed with

6

painful right shoulder and diabetes mellitus.  (AR 586.)  May 13, 1983 right shoulder x-rays revealed neither evidence of fractures nor calcific densities adjacent to the right shoulder joint.  (AR 603.)  A treating physician noted on May 13, 1983 that multiple physicians told plaintiff "that they found nothing wrong with his shoulder and that the problem" is in his head.  (AR 586.)  The physician further noted that a psychiatrist could not find a psychiatric explanation and that plaintiff "understands that this is probably 'in my head.'"  (AR 586.)  The physician was convinced of plaintiff's "desire to get well" and recommended shoulder manipulation under anesthesia to give plaintiff a chance to work.  (AR 586.)  In August 1983, plaintiff was feeling "pretty good."  (AR 583.)  During October– December 1983, plaintiff was assessed with diabetes mellitus, at times uncontrolled, and placed on a 1,200-calorie diet.  (AR 576-582.)

During January – May 1984, plaintiff was assessed with diabetes mellitus, sometimes uncontrolled or under poor control, and continued on insulin.  (AR 564-575.)  On July 3, 1984, plaintiff stated he had no complaints and was "doing fine."  (AR 563.)  During July – December 1984, plaintiff was assessed with diabetes mellitus, sometimes uncontrolled, and continued on insulin.  (AR 553-563.)  Plaintiff noted he was feeling better.  (AR 555, 558.)

During 1985, plaintiff continued his treatment for diabetes mellitus and appeared in no acute distress.  (AR 520-523, 526, 528, 530, 532, 533, 538, 540, 541,543, 544.) According to May 30, 1985 notes, dieting attempts provided little success for plaintiff's diabetes mellitus.  (AR 530.)  On June 14, 1985, plaintiff admitted to his continuation of "partaking many foods with high calorie content."  (AR 527.)  July 23, 1985 notes reflect that plaintiff was "doing well" and had no complaints.  (AR 523.)  August 23, 1985 notes reflect plaintiff's "history of irregularity of diet" and that he had no complaints.  (AR 522.)  On September 6, 1985, plaintiff noted that he felt "very good."  (AR 521.)  September 13, 1985 notes reflect plaintiff's "difficulty following a dietary regimen" and absence of other complaints.  (AR 520.)  October 29, 1985 notes state that plaintiff "denies any problems related to the diabetes.  He states that he has recently started working as a window washer and is exercising with the purpose of weight reduction."  (AR 518.)

On November 4, 1986, plaintiff returned "after a long absence" and complained of an itchy rash on his right leg and skin bump in his right groin.  (AR 517.)  Plaintiff was in no acute distress.  (AR

517.)  Plaintiff received November 19, 1986 follow up care for diabetes mellitus, in poor control, and skin rash, and his insulin was increased.  (AR 515.)  During the remainder of 1986, plaintiff received treatment for diabetes mellitus, at times under poor control.  (AR 508, 511-514.)

In January 1987, plaintiff continued his treatment for diabetes mellitus, denied new problems, and stated he was "okay."  (AR 498, 503, 505.)  As of January 29, 1987, plaintiff's diabetes mellitus had improved.  (AR 498.)  During the remainder of 1987, plaintiff continued to treat for diabetes mellitus and was in no apparent distress.  (AR 468, 474, 476, 478, 483, 485-487, 489, 491-496.)  On April 3, 1987, plaintiff felt good and had no complaints.  (AR 491.)  As of May 21, 1987, plaintiff's diabetes mellitus was under "[m]uch better control."  (AR 486.)  July 9, 1987 notes reflect that for the past six years, plaintiff experienced aching in his hands, decreased grip strength and an apparent frozen left shoulder.  (AR 479.)  Plaintiff's hand discomfort was attributed to secondary to early degenerative arthritis but more than likely secondary to diabetic neuropathy.  (AR 479.)  On September 25, 1987, plaintiff noted that he exercised daily.  (AR 474.)  October 2, 1987 notes indicate improvement of plaintiff's diabetes mellitus and that plaintiff was feeling well except for feeling depressed from inability to control his diabetes.  (AR 469, 471.)

January 30, 1995 notes reflect that plaintiff's diabetes mellitus was "very well controlled" with adherence to diet and that plaintiff was recovering from his right big toe amputation.  (AR 873.)  During early 1995, plaintiff received treatment for his right foot and second toe.  (AR 863-873.)  On April 22, 1995, plaintiff's second right toe was amputated.  (AR 862.)  April 27, 1995 notes reflect that plaintiff's diabetes mellitus seemed stable and that his hypertension was controlled.  (AR 863.)  Plaintiff received continuing treatment in spring 1995 for toe amputations.  (AR 852-862.)  July 3, 1995 notes indicate that plaintiff's diabetes mellitus was fairly stable.  (AR 855.)  On August 31, 1995, plaintiff was assessed with stable diabetes mellitus and complications of diabetic peripheral neuropathy and severe atrophy of arms and hands.  (AR 849.)  September 29, 1995 notes reflect that plaintiff had a right below-the-knee amputation because of gangrene.  (AR 848, 993.)  Plaintiff was fitted for prosthesis.  (AR 993.)  Plaintiff received continuing treatment in fall 1995 for his below-the-knee amputation.  (AR 838, 839, 841-845.)  November 2, 1995 notes reflect that plaintiff's diabetes mellitus was not well controlled.  (AR 845.)  As of November 20, 1995, plaintiff's diabetes mellitus was controlled and his blood pressure was stable

1    without medication.  (AR 841.)

2          In 1996, plaintiff received continued treatment for his below-the-knee amputation.  (AR 834-

3    837.) January 22, 1996 notes reflect plaintiff's diabetes mellitus was under better control.  (AR 836.)

4    As of March 19, 1996, plaintiff's diabetes mellitus seemed stable.  (AR 833.)  On April 19, 1996,

5    plaintiff was admitted to Tulare District Hospital to address his infected left foot with an IV antibiotic

6    and whirlpool treatment.  (AR 825-826.)  During spring and early summer1996, plaintiff received

7    continued treatment for his infected left foot and was assessed with low grade cellulitis.  (AR 808-822.)

8          In January 1998, plaintiff resumed treatment after a fall and experienced chest pain.  (AR 988-

9    990.)  A February 18, 1998 emergency department note characterizes plaintiff as a "non-compliant

10   insulin dependent diabetic" and "very stubborn and uncooperative."  (AR 979.)  During 1998, plaintiff

11   was treated for multiple infections and left foot issues.  (AR 909, 911, 914, 916, 918, 919, 921- 924,

12   926-931, 932, 934, 939, 940, 943, 944, 946, 948, 950, 952, 953,956-963, 965-973 ,975-978.)

13                    *Veterans Administration Medical Center*

14         Through the Veterans Administration, plaintiff received treatment for diabetes, obesity and right

15   shoulder pain.  September 1980 notes address plaintiff's claim that he injured his right shoulder during

16   work on June 13, 1980.  (AR 303.)  September 11, 1980 x-rays of plaintiff's right shoulder reveal a

17   minor degenerative condition but otherwise unremarkable.  (AR 329.)  September 11, 1980 notes

18   indicate that plaintiff had cortisone injections and ultrasound treatment without relief.  (AR 309, 728.)

19   According to the notes, plaintiff was never diagnosed with inability to work or to use a sling.  (AR 309,

20   728.)  The notes further indicate tenderness to plaintiff's right shoulder on palpitation and that plaintiff

21   did not need to be hospitalized for shoulder problem.  (AR 311, 728.)  On September 15, 1980, plaintiff

22   chiefly complained of right shoulder pain for three months, and examination revealed right shoulder

23   tenderness on movement and tenderness anteriorly.  (AR 324, 332, 726.)  Plaintiff was diagnosed with

24   diabetes mellitus and right shoulder pain, etiology to be determined.  (AR 325, 727.)  A September 22,

25   1980 hospital summary noted plaintiff's right shoulder tenderness and diabetes well-controlled with

26   insulin.  (AR 330, 721.)  September 23, 1980 x-rays of plaintiff's right shoulder revealed neither gross

27   fracture, dislocation nor other traumatic derangement.  (AR 328.)  October 17, 1980 x-rays of plaintiff's

28   right shoulder revealed no evidence of calcific tendinitis.  (AR 334.)  November 1980 notes reflect

                                        9

plaintiff's right shoulder pain and obesity. (AR 301.) November 18, 1980 x-rays of plaintiff's right shoulder revealed no abnormality. (AR 334.) December 9, 1980 notes reflect plaintiff's goal to lose 80 pounds and instructions to plaintiff on a diabetic diet and to increase activity in light of plaintiff being "very inactive." (AR 299, 300, 805, 806.)

On February 24, 1981, plaintiff complained of sharp, pulling pain in his right upper extremity. (AR 341, 804.) March 23, 1981 notes emphasize plaintiff's obesity. (AR 297, 803.) March 26, 1981 notes reflect plaintiff was instructed on a 1,500-calorie diabetic diet but cannot follow it because of lack of will power. (AR 802.) An April 2, 1981 nerve conduction study of plaintiff's right upper extremity suggested mild compressive neuropathy. (AR 335.) An April 2, 1981 electromyographic study of plaintiff's right upper extremity was normal. (AR 335.) April 2, 1981 notes reflect an absence of "definitive evidence" of radiculopathy or peripheral neuropathy. (AR 296, 802.) April 2, 1981 physician notes state that plaintiff had used a sling since his June 13, 1980 injury and that plaintiff showed limited passive range of motion in either the shoulder or elbow joints. (AR 340, 350, 704.) An April 2, 1981 nerve conduction velocity study revealed mild slowing of conduction of the right ulnar nerve about the elbow. (AR 705.) An April 2, 1981 electromyographic study of plaintiff's right upper extremity was normal. (AR 705, 801.) On April 21, 1981, plaintiff started physical therapy for his right shoulder. (AR 801.) July 6, 1981 notes indicate deceased pain to and limited range of motion for plaintiff's right arm and that plaintiff continued to receive physical therapy. (AR 321, 800.) The notes state that nerve conduction studies do not support a polyneuropathy diagnosis and that plaintiff received physical therapy for his right shoulder. (AR 321.)

On July 20, 1981, plaintiff's shoulder was painful when pressed on and there was limited tenderness in all range of motion. (AR 799.) The July 20, 1981 notes reflect plaintiff's twice a week physical therapy. (AR 709.) A July 20, 1981 diagnosis for plaintiff was diabetes mellitus and chronic shoulder pain. (AR 351, 799.) August 31, 1981 notes reflect that plaintiff did not go to physical therapy due to lack of insurance coverage and that plaintiff experienced pain in his right shoulder and deltoid region with dumbness spreading to his fingers. (AR 797, 798.) The notes further state "dismiss that this is the malingering." (AR 797.) Plaintiff was assessed with a painful right shoulder and diabetes mellitus uncontrolled. (AR 797.) On September 3, 1981, plaintiff was assessed with autonomic dystrophy and

poor control of diabetes mellitus.  (AR 796.)  On September 23, 1981, plaintiff complained of constant right shoulder pain.  (AR 713.)  Examination revealed decreased right shoulder range of motion and deltoid tenderness.  (AR 713.)  On November 2, 1981, plaintiff was assessed with poor control of diabetes mellitus.  (AR 795.)  December 2, 1981 notes reflect plaintiff felt worse and had no relief from a November 17, 1981 stellate ganglion block.  (AR 790, 793.)  The notes further reflect "no question about him having organic disease" but "some fixation of symptoms."  (AR 792.)  According to the notes, plaintiff "has a medical problem which has not been diagnosed."  (AR 788.)

On January 4, 1982, plaintiff's right shoulder was swollen and painful on movement.  (AR 786.) January 4, 1982 notes state that plaintiff's diabetes mellitus will not be controlled if plaintiff does not reduce his diet.  (AR 786.)  On January 26, 1982, plaintiff complained of a mass in his right shoulder and which changes in size.  (AR 783.)  On February 1, 1982, plaintiff complained that he is unable to grasp objects and to raise his hand above his shoulder.  (AR 682.)  Examination revealed tenderness to touch of right shoulder and apparent wasting of muscles.  (AR 682, 683.)  Plaintiff was assessed with right arm reflex distrophy.  (AR 683.)  February 2, 1982 cervical spine x-rays revealed minimal kyphosis at the C4-5 level and were otherwise negative.  (AR 768.)  On February 18, 1982, plaintiff was assessed with right arm autonomic dystrophy and poorly controlled diabetes mellitus.  (AR 674.)  A February 22, 1982 electromyographic study of plaintiff's right upper extremity was normal.  (AR 663.)  In all muscles, amplitude duration and configuration of voluntary action potentials were normal.  (AR 663.)  A February 22, 1982 nerve conduction velocity study revealed significant reduction in conduction velocity in the ulnar nerve about the elbow to reaffirm prior diagnosis of mild ulnar neuropathy at the elbow.  (AR 662.) A March 16, 1982 examination revealed an area of subcutaneous edema over the right deltoid muscle laterally, 2/5 strength in all right arm muscle groups, no evidence of muscle wasting except atrophy of the right supraspinous muscle, and limited right shoulder range of motion from pain.  (AR 657.) Plaintiff was to return for physical therapy twice weekly.  (AR 658.)  March 29, 1982 physical therapy notes recommended that plaintiff "work through some pain."  (AR 779.)

On April 12, 1982, plaintiff continued to complain of considerable pain, was treated with active and passive range of motion exercises and ice packs, and was continued on twice a week physical therapy.  (AR 777.)  There was a small increase in plaintiff's right shoulder range of motion.  (AR 777.)

11

1   On April 22, 1982, plaintiff stated he had increased motion but more pain.  (AR 776.)  Plaintiff was

2   assessed with reflex dystrophy to his right shoulder and pain personality.  (AR 776.)  April 26, 1982

3   physical therapy notes reflect a slight range of motion increase.  (AR 775.)  On May 3, 1982, plaintiff

4   complained of right shoulder pain on movement.  (AR 774.)  Notes reflect some atrophy of plaintiff's

5   deltoid.  (AR 774.)  Plaintiff was assessed with diabetes mellitus, not well controlled.  (AR 774.)  May

6   10, 1982 physical therapy notes reflect plaintiff's treatment of active and passive range of motion

7   exercises and ice packs.  (AR 773.)  According to the notes, plaintiff held his right arm at his side, was

8   is guarded, and experienced small range of motion improvement.  (AR 773.)  May 14, 1982 notes reflect

9   plaintiff's slow improvement.  (AR 773.)  June 3, 1982 physical therapy notes reflect plaintiff had 19

10  physical therapy treatments during March 5, 1982 and May 10, 1982.  (AR 773.)  The notes also reflect

11  that plaintiff missed many appointments.  (AR 772.)  July 15, 1982 notes reflect that plaintiff's

12  sympathetic dsytrophy "is essentially unimproved" despite physical therapy.  (AR 769.)

13  *Frank W. Kleist, M.D., Consultative Psychiatrist*

14  Frank W. Kleist, M.D. ("Dr. Kleist"), a psychiatrist, conducted a consultative examination of

15  plaintiff and prepared a May 18, 1981 report.  (AR 342.)  Dr. Kleist noted that plaintiff was in "special

16  classes" because of "a special learning problem" and got out of eighth grade at age 18.  (AR 343.)

17  Plaintiff never learned to read and write.  (AR 343.)  The mental status examination revealed that

18  plaintiff admitted that he did not know the months of the year in order and could not identify the then

19  current president or governor.  (AR 343.)  Although plaintiff had problems with serial sevens, he was

20  able to perform simple arithmetic problems.  (AR 343.)  As for reading, plaintiff was able to identify

21  only two-letter words, including it, to and is.  (AR 343.)  Dr. Kleist found plaintiff's abstract thinking

22  adequate.  (AR 343.)  Dr. Kleist found no evidence of disturbed thinking and that plaintiff appeared

23  "moderately depressed" supported by feeling as if he wanted to cry, insomnia, easy fatigability, trouble

24  concentrating, restlessness, indecisiveness, and feelings of hopelessness.  (AR 344.)  Kr. Kleist noted

25  no significant problems with judgment and that plaintiff's insight "was characterized by a feeling that

26  his arm problem was not in his head because if it were 'how could it bring up a knot on my arm.'"  (AR

27  344.)

28  Kr. Kleist observed that plaintiff winced with pain and protected his right arm and that there was

12

marked right grip weakness.  (AR 344.)  Kr. Kleist noted that a non-verbal intelligence test revealed a 102 IQ "which was a bit of a surprise, considering how poorly he had done on other parts of the mental status testing. [This test is based on identifying parts or emotions or conditions which the subject has to identify in one of four pictures.]"

As to daily functioning, Dr. Kleist found: (1) mild impairment in ability to relate to others and appearance and ability to care for personal needs; (2) moderate impairment to changes in interests or habits as a result of impairment; and (3) moderate to moderately serious impairment to restrictions of daily activities as a result of impairment.  (AR 344.)  Dr. Kleist diagnosed dysthymic disorder or depressive neurosis, secondary to disability and conversion disorder characterized by pain and weakness of the right upper extremity.  (AR 344.)  Dr. Kleist found no problem with plaintiff's ability to relate to others or to understand and follow oral instructions.  (AR 344.)  Dr. Kleist further found mild impairment to maintain attention for simple repetitive tasks and moderately serious impairment to withstand day-to-day work stress and pressure.  (AR 344.)  Dr. Kleist concluded:

> . . . it is possible that there is some organic component to the condition.  It is not uncommon for a neurological or physical disorder to progress to a prolonged state of invalidism and loss of function. . . . If this is indeed a conversion symptom the longer it persists the more difficult it is to eradicate.  It would also be useful to get him involved in a vocational training program as soon as possible so that he isn't preoccupied with his disability and loss of self-esteem and is occupied with doing something which will minimize loss of function and give him a sense of hope.  (AR 345.)

### *J. Blasquez, M.D., Treating Psychiatrist*

J. Blasquez, M.D. ("Dr. Blasquez"), plaintiff's treating psychiatrist completed a July 24, 1981 mental disorders evaluation form to note plaintiff's then present complaints and symptoms of depression, nervousness, anxiety and inability to move right shoulder.  (AR 346.)  Dr. Blasquez noted plaintiff's "very serious financial problems," which contributed to plaintiff's stress. (AR 346.)  As to mental status, Dr. Blasquez noted plaintiff was pleasant and cooperative and worried about his physical condition. (AR 347.)  Dr. Blasquez found that plaintiff's memory was intact for present and remote events and that "intellectually he functions at the moderate range of mental deficiency."  (AR 347.)  According to Dr. Blasquez, plaintiff was depressed and anxious with "very strong psychophysicalogical disturbance pertaining to his right shoulder."  (AR 347.)  As to daily activities, Dr. Blasquez noted that plaintiff "isolates himself a great deal[;] cannot drive a car because of his physical handicap, he is not capable

1  to perform any type of physical activity involving his upper extremities.  (AR 348.)  Dr. Blasquez

2  diagnosed atypical somatoform disorder and chronic depressive disorder.  (AR 349.)  Prognosis was

3  guarded with six months to a year expected as to improvement.  (AR 349.)

### *David S. Ascher, M.D., Consultative Examiner*

5  David S. Ascher, M.D. ("Dr. Ascher"), conducted an August 24, 1981 consultative examination

6  of plaintiff and prepared a report.  (AR 352.)  Plaintiff's chief complaints were constant right shoulder

7  and arm pain causing plaintiff to use his left hand and inability to raise his right arm over the shoulder.

8  (AR 352.)  Dr. Ascher diagnosed diabetes mellitus, probable right bicipital tendinitis and subdeltoid

9  bursitis, and obesity.  (AR 353.)  Dr. Asher found plaintiff totally disabled from his regular, customary

10  duties and suggested rehabilitating plaintiff in another field.  (AR 354.)

### *C.A. Luckey, M.D., Consultative Physician*

12  C.A. Luckey, M.D. ("Dr. Luckey"), conducted a May 18, 1982 consultative examination and

13  prepared a report.  (AR 359.)  Dr. Luckey noted plaintiff's chief complaints of right upper extremity

14  pain, inability to lift arm, and developed weakness from pain.  (AR 360.)  Dr. Luckey concluded that

15  plaintiff's "self-inflicted disuse" and over-assistance of his wife "is making an invalid out of him."  (AR

16  362.)  Dr. Luckey recommended that plaintiff "get rid of his sling, totally and completely."  (AR 362.)

17  Dr. Luckey explained:

> He obviously could have a good right upper extremity, if he was willing to rehabilitate
> himself.  By this, I mean, he must use his hand. . . . This man must be encouraged to use
> his hand continuously.  If he will get rid of the sling and use the hand there is every
> reason to feel that he will return essentially to normal.  (AR 362.)

### *Paul J. Schommer, M.D., Consultative Physician*

22  Paul J. Schommer, M.D. ("Dr. Schommer"), conducted a November 4, 1987 consultative

23  examination to note that plaintiff deviates from his 1,200-calorie diet and has been unsuccessful in

24  multiple weight loss attempts.  (AR 737.)  Dr. Schommer's examination revealed 35-pound right hand

25  grip strength and 90-pound left hand grip strength with full range of motion in the upper and lower

26  extremities bilaterally.  (AR 739.)  Dr. Schommer graded the muscle groups at 5/5, except those for the

27  right upper extremity which graded at 4+/5.  (AR 740.)  As to his neurological examination, Dr.

28  Schommer commented:

14

Muscle tone, bulk and strength [were] essentially within normal limits with the exception of the upper extremity . . . There is mild decreased grip strength of the right hand, although the fine motor function appears to be intact. . . . Patient was tested for pinprick and temperature sensation over the upper and lower extremities to try to rule out a peripheral neuropathy. His responses were quite erratic, making interpretation almost impossible. I wondered if he might somehow be malingering with that part of the exam. (AR 740.)

Dr. Schommer assessed diabetes mellitus with reportedly good control but requiring massive insulin doses and minimal right hand and upper extremity dysfunction of uncertain etiology and significance. (AR 740.)

### Luis H. Velosa, M.D., Consultative Psychiatrist

Luis H. Velosa, M.D. ("Dr. Velosa"), conducted a December 11, 1987 consultative psychiatric examination during which plaintiff related six to seven years of chronic depression which had worsened through the years. (AR 741.) Plaintiff noted his ability to care for his basic needs. (AR 742.) Dr. Velosa's mental status examination revealed that plaintiff was oriented to time, place and person, that his speech was rational, coherent and goal oriented, that his recent and remote memory were intact, and that his thinking process was normal. (AR 742.) Dr. Velosa further observed:

As far as his affect, there is evidence of an affective disorder. He displays symptoms of depression, sadness, irritability, moodiness and crying spells. There is chronic dysphoric mood, feelings of helplessness and feelings of hopelessness. The claimant does not exhibit vegetative signs of depression. . . . There is also some evidence of suicidal ideations but no suicidal gestures. Judgment is adequate, and he has some insight into his difficulties. (AR 742.)

Dr. Velosa diagnosed severe dysphoric disorder with suicidal tendencies and opined:

His psychiatric symptoms, as well as his physical illness, has greatly limited his overall psychosocial and occupational functioning. The claimant is not able to follow simple tasks. He is unable to withstand the pressure associated with the everyday working activities. Prognosis is poor. I wonder whether he will be able to obtain gainful employment on a permanent basis. (AR 743.)

### Psychiatric Review Technique

Maximo Parayno, Jr., M.D. ("Dr. Parayno"), completed a January 18, 1988 Psychiatric Review Technique to note presence of evidence for Listing 12.04 A. and B. of the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1 ("Listing of Impairments"). (AR 745.) Dr. Parayno noted that plaintiff experienced marked restriction of daily living activities and difficulties maintaining social functioning and often deficiencies of concentration, persistence or pace. (AR 752.)

15

*James B. Fishback, Ph.D., Psychologist Retained By Plaintiff*

Plaintiff's counsel retained James B. Fishback, Ph.D. ("Dr. Fishback"), a psychologist, to determine plaintiff's current IQ as of Dr. Fishback's March 2001 evaluation, to assess plaintiff's thinking and cognitive abilities in 1985, and to opine whether plaintiff's then current (March 2001) and past (1985) cognitive abilities are consistent. (AR 1014.) Dr. Fishback conducted his evaluation on March 10, 12 and 13, 2001. (AR 1014.)

Plaintiff explained to Dr. Fishback that plaintiff attended special education classes, achieved up to the sixth grade, and has never been able to read. (AR 1015.) Dr. Fishback found plaintiff's memory poor in the short term and fair in the long term. (AR 1015.) Plaintiff noted that he was able to remember what he was doing in 1985 and that in 1985, his arm was frozen due to his 1980 work injury and that he had uncontrolled diabetes. (AR 1016.) Plaintiff recounted that in 1985, he had trouble concentrating on anything "involving reading" and "most thinking that requires learning." (AR 1016.)

Plaintiff's wife Juanita Gomez ("Mrs. Gomez") noted that in 1985, she noticed plaintiff's constant reading deficits and that she read plaintiff's work applications and completed them because plaintiff had a hand injury and could not spell. (AR 1017.) Mrs. Gomez noted that plaintiff in 1985 forgot days of the week, months, doctors' appointments, and birthdays. (AR 1017.) Mrs. Gomez described plaintiff as a "slow learner" who was easily distracted. (AR 1017.) Mrs. Gomez stated that plaintiff's thinking problems in 1985 continued as of the date of Dr. Fishback's evaluation. (AR 1018.)

Dr. Fishback administered the Wechsler Adult Intelligence Scale – Third Edition ("WAIS III") and assessed plaintiff a 74 Verbal IQ, 73 Performance IQ, and 71 Full-Scale IQ (68-76 at 5 percent error level). (AR 1018.) Dr. Fishback found that the scores placed plaintiff "in the Borderline area of intelligence," just above mild mental retardation. (AR 1018.) According to Dr. Fishback, plaintiff scored below normal limits on every IQ subtest except two. (AR 1019.) Dr. Fishback assessed that plaintiff's subtest scores most sensitive to attention are in the borderline or mentally-retarded areas to suggest exceptional attentional processing problems and that plaintiff's "current thinking is like that of a truly mentally-retarded individual." (AR 1020.)

Turning to Dr. Kleist's 1981 psychiatric evaluation, Dr. Fishback surmised Dr. Kleist had given plaintiff the Quick Test based on Dr. Kleist's description to the test and examples of responses. (AR

1020.) Dr. Fishback opined that the Quick Test "is never used to provide definitive IQ scores but only very rough estimates." (AR 1020.) Dr. Fishback claimed that the Quick Test capitalized on skills found in "puzzle-making and vocabulary," two of plaintiff's best abilities but ignored plaintiff's working memory skills and processing speed skills, two of his worst abilities. (AR 1020.) Dr. Fishback noted that the Quick Test examines a small fraction of skills comprising a comprehensive intelligence, such as the one Dr. Fishback administered. (AR 1020.)

Dr. Fishback noted "[t]here does not appear to be any evidence of malingering currently or in the past." (AR 1021.) Dr. Fishback opined that plaintiff "was approximately as cognitively deficient in 1985 as he is today. Lower scores would be normal today simply due to the aging effect on thinking, as it would be for anyone, and to the progressive effects of diabetic complications." (AR 1021.) Dr. Fishback further opined:

> . . . the above cognitive and work impairments, documented by Dr. Kleist, Mr. Gomez, and Mrs. Gomez, and operating in the period from 1981 to 1985: (1) were likely due to considerable cognitive impairment at that time, and (2) were serious and well-developed at that time, and have continued to worsen up to the current time due to age, injury, and diabetic complications.
>
> It is also the opinion of the evaluator that Mr. Gomez would be incapable of any job today that would involve having to read any instructions, or involve reading or writing as part of his job performance. Even if he were provided only spoken instructions for a job, even if the task was repetitive, and even if it involved assembly of parts (his cognitive strength), it is likely that Mr. Gomez would over time forget some aspect of the task, become confused with some sequence, or loose attention and become distracted, unless he was continually reminded through repetitive spoken instructions. However, this evaluator believes that Mr. Gomez is in the future capable of learning some assembly skill that would not require continuous verbal supervision, but that this would require long-term, patient, one-on-one training. (AR 1021-1022.)

Dr. Fishback diagnosed Attention-Deficit/Hyperactivity Disorder, predominantly inattentive type, Dysthymic Disorder, Conversion Disorder, by history, Reading Disorder, and Borderline Intellectual Functioning. (AR 1022.)

Dr. Fishback prepared a July 3, 2005 supplemental evaluation report in response to the ALJ's request for an assessment whether plaintiff's condition during June 13, 1980 to September 1, 1987 met or medically equaled an impairment in the Listing of Impairments. (AR 1104.) Dr. Fishback noted that plaintiff's then current IQ scores would be expected to be somewhat lower than his 2001 IQ scores due to aging and progressive diabetes effects "but not significantly." (AR 1105.) "[W]orking retroactively,"

1   Dr. Fishback surmised that plaintiff's 2001 IQ score of 71 "should be very consistent with his in 1980-

2   1987 IQ score." (AR 1105.) Dr. Fishback noted that according to Mrs. Gomez, during 1980-1987,

3   plaintiff was twice as good as then (July 2003) in communication and daily living and social skills. (AR

4   1107.)

5          Dr. Fishback concluded that during 1980-1987, plaintiff meet the criteria of section 12.05

6   (mental retardation) of the Listing of Impairments. (AR 1109.) Dr. Fishback reasoned that given

7   plaintiff's "very serious deficits in daily living skills, communication skills, social skills, concentration,

8   persistence, and pace of completing tasks, it appears very reasonable to place his IQ at the lower end of

9   its 68 to 76 range, i.e. squarely at the mild mentally-retarded level." (AR 1109.) Dr. Fishback admitted

10  that "the literal IQ criteria of 12.05 (D) is not met." (Underlining in original.) Nonetheless, Dr. Fishback

11  concluded:

12       . . . Mr. Gomez would be incapable during the period 1980 to 1987, and today, of any job
         involving simple repetitive tasks. Though Mr. Gomez is good at assembling parts,
13       psychologically he cannot do this task, or any other simple one, over and over with
         consistent quality and competent completion. The serious limitations in his thinking and
14       possessing of information would result in serious inattention and loss of concentration,
         forgetting important aspects of the task, becoming seriously confused with some
15       sequence of the task, failing far behind in any reasonable pace, being unable to
         psychologically cope with serious workplace stress and pressure because of the deep
16       frustration and depression he feels in not being able to perform well and to contribute,
         and not being able to consistently and accurately communicate on a basic level with his
17       supervisor. (AR 1109-1110.)

18                      ***Judith A. Willis, M.D., Nonexamining Physician***

19         In April 2001, the ALJ requested Judith A. Willis, M.D. ("Dr. Willis"), a neurologist, to review

20  medical records and to answer the ALJ's interrogatories. (AR 1043.) As to plaintiff's physical residual

21  functional capacity, Dr. Willis opined:

22       I would suggest not lifting more than 25 lbs occasionally with the right hand, 10
         lbs. frequently. Using both hands he could lift 50 lbs occasionally, 25 lbs. frequently.
23       He would have moderate restriction on forceful gripping, sustained pushing or pulling
         with the RUE [right upper extremity]. Because of subjective foot pain he should not
24       stand or walk more than 4 hours a day or more than 2 hours without a 15-minute
         opportunity to sit. He should avoid sustained use of foot pedals that require forceful
25       pressure for more than 3 hours a day, 30 minutes at a time.

26       Because his foot discomfort could compromise balance, he should avoid working
         at heights or climbing ladders, etc. where loss of footing could cause injury. (AR 1046.)
27

28  In response to the ALJ's inquiry whether clinical findings support RSD, Dr. Willis explained that

1   RSD is a painful disorder which usually follows a significant limb trauma.  (AR 1047.)  Dr. Willis

2   explained RSD characteristics and cast doubt on an RSD diagnosis:

3           Burning or deep aching pain is the cardinal feature of RSD.  It is at this stage that the
            disorder my be characterized as sympathetically mediated pain (SMP), and at which time
4           sympathetic nerve blocks, if applied, may provide dramatic improvement in symptoms.
            Sometimes this response is used as a "diagnostic" sympathetic nerve block, which is
5           taken as proof of the presence of RSD because of pain relief by virtue of the block.  Mr.
            Gomez had stellate ganglion blocks without relief of the pain in 1981 or 1982.  (AR
6           1047.)

7   Dr. Willis further noted the absence of other RSD features and no more than mildly abnormal

8   electromyography/nerve conduction velocity studies to suggest "possible localized compression from

9   wearing a sling rather than a generalized peripheral neuropathy."  (AR 1047.)

10                  ***Richard S. Goka, M.D., Consultative Physician Retained By Plaintiff***

11          Plaintiff's counsel retained Richard S. Goka, M.D. ("Dr. Goka"), to conduct a May 28, 2003

12  consultative examination and to prepare a June 30, 2003 report.  (AR 1089.)  Dr. Goka noted plaintiff's

13  amputations of the right lower extremity in September 1996, left lower extremity in May 1999, and left

14  index finger in April 2000.  (AR 1089.)  Dr. Goka assessed a history of RSD or Complex Regional Pain

15  Syndrome of the right upper extremity dating to the early 1980s with resulting right arm pain and frozen

16  shoulder, diabetes mellitus with peripheral neuropathy, evidence of depression and anxiety secondary

17  to pain, and evidence of functional illiteracy with low or borderline IQ.  (AR 1092.)  Dr. Goka opined

18  that as of the 1980s, plaintiff would have been diagnosed appropriately with RSD and with time "the

19  syndrome stabilizes or burns out and the residual symptoms are present but do not really change."  (AR

20  1092, 1093.)  Dr. Goka concluded:

21          Mr. Gomez before September 1, 1985 did suffer from medical conditions that did have
            severe impairments: A.) Reflex Sympathetic Dystrophy of the dominant Extremity; B.)
22          Right Frozen Shoulder; C.) Early peripheral neuropathy secondary to his Diabetes.  This
            would have limited his use of his dominant extremity to less than an assist arm.  He
23          would have been cross-trained to become left arm dominant.  Strength in all planes of
            use of the right arm would have been less than 25% of his norm.  Mr. Gomez would not
24          have been able to lift more than five pounds with his dominant extremity and a
            maximum of twenty pounds with both arms on an occasional basis.  He had no
25          restrictions in walking or standing at that time.  He further has/had D.) A low
            intelligence; and E.) Depression and anxiety that would limit his mental capacity.  (AR
26          1095.)

27  Dr. Goka surmised that by late 1981, plaintiff was unlikely to have regained enough right dominant area

28  function to be employable and would have been physically restricted to sedentary work with occasional

walking and prohibited from lifting more than 10 pounds. (AR 1095.) Dr. Goka targeted the beginning of plaintiff's disability to no later than the end of 1982. (AR 1096.) According to Dr. Goka, in 1985, plaintiff would have been totally and permanently disabled and unable to perform the full range of sedentary work, which would have required use of both his arms and would have increased his symptoms to render him more dysfunctional. (AR 1095.)

*Medications*

Plaintiff's medications have included Novolin 70/30 Insulin, Nizoral 200 mg, Glucophage 880 mg, Neurontin 300 mg, Lotenssin 10 mg, Indapamide 1.25 mg, Lipiton 20 mg, Aspirin 81 mg, Lonox, Promethazine/Codeine syrup, Ferrous Sulfate, Ibuprofen 600 mg, Hydrocodone, Quinine, Tobra Dex, Dieloxacillin 500 mg, and Isosorb 5 mg. (AR 898-899.)

**Plaintiff's Activities And Testimony**

*Questionnaires And Statements*

In an October 8, 1987 Disability Report, plaintiff claimed disability based on inability to stand "very long at one time," inability to use right arm "to full capacity," and diabetes. (AR 434.) Plaintiff explained that a right shoulder pinched nerve numbed and weakened his right arm. (AR 434.) Plaintiff noted that his activities included lawn mowing and driving a car. (AR 437.) In a November 16, 1987 Vocational Report, plaintiff noted: "I have tried and tried to find work but when they find out I hurt my right arm at my last job, they always say someone else is better qualified." (AR 449.)

In a September 30, 1994 Disability Report, plaintiff claimed he was disabled from a pinched back nerve to affect his right shoulder and arm, to negate his arm strength, and to limit his lifting to two pounds. (AR 422.) Plaintiff noted that he drives a car. (AR 425.) In an undated Disability Report, plaintiff attributed his disability to diabetes, loss of hand and arm strength and worsened hearing and eye sight. (AR 428.) Plaintiff noted that his activities included cooking and cleanly daily, shopping three times a week, fishing, and driving a car. (AR 431.) Plaintiff claimed that he was unable to lift 20 pounds. (AR 433.)

In a May 24, 1993 Reconsideration Disability Report, plaintiff noted his difficulty to walk, fatigue, and hearing problem requiring a hearing aid. (AR 460, 462.) In an October 30, 1995 statement, plaintiff noted removal of his right foot and limited daily activities. (AR 464.)

*Plaintiff's July 30, 1998 ALJ Hearing Testimony*

Plaintiff appeared at the July 30, 1998 ALJ hearing without counsel and waived the right to representation. (AR 72.) The ALJ explained that plaintiff needed to demonstrate disability between his June 13, 1980 alleged onset of disability and September 30, 1985, when plaintiff was last insured for disability insurance benefits. (AR 72.) Thus, the ALJ noted that the limited issue was plaintiff's disability status during June 13, 1980 to September 30, 1985. (AR 73.)

Plaintiff testified that he had special education classes up to the sixth grade level. (AR 77.) Plaintiff knows the letters of the alphabet but cannot read. (AR 77.) Plaintiff did not work during June 13, 1980 to September 30, 1985. (AR 78.) Plaintiff had worked as a bundle handler and needed to lift more than 100 pounds. (AR 78.) Plaintiff claims that he became disabled when tried to lift and his right (dominant) arm "went dead" with loss of movement and strength. (AR 78, 79.) Plaintiff was originally treated for bursitis and given cortisone shots which did not provide relief. (AR 78, 79, 84.)

Plaintiff received treatment for insulin dependent diabetes in 1979 or 1980. (AR 80.) Plaintiff started taking insulin shots in 1985 or 1986. (AR 80.) Prior to starting insulin shots, plaintiff experienced neither diabetic retinopathy affecting his eyes, neuropathy affecting his kidney nor end organ damage. (AR 81.)

Prior to September 1985, only plaintiff's arm problem affected his work ability. (AR 82.) Plaintiff refused surgery to his right arm because he was told there was a 99 percent chance he would go into a coma, die and/or would not be able to move his body from the neck down. (AR 85.) Plaintiff received physical therapy up to three times a week at the Veterans Administration Hospital for three or four years. (AR 85-86.) Plaintiff stopped receiving physical therapy because a new law limited such treatment to service connected matters. (AR 86.) Physical therapy did not improve plaintiff's arm. (AR 86.) Cold and packs provided slight improvement but plaintiff never regained control to his arms or strength to his hands. (AR 87, 89.) Plaintiff's original doctor placed his arm in a sling. (AR 88.)

Plaintiff claimed a pinched nerve was discovered in his spine for which he was to be injected with dye but refused because the dye would enter his blood. (AR 87.)

During 1980-1985, plaintiff could not use his right hand in which he experienced numbness and tingling. (AR 91, 92.) Plaintiff's left hand was fine. (AR 91.) Pain pills did not assist to relieve pain.

(AR 92.)

Plaintiff drove during 1980-1985 without problem.  (AR 88.)  Plaintiff was able to dress and bath himself "[t]o an extent" and due to modesty refused assistance to use the bathroom.  (AR 90.)  After plaintiff stopped working, he was unable to help out around the house.  (AR 90.)

Plaintiff was not treated for mental health issues by a psychiatrist or psychologist.  (AR 89-90.)

### Plaintiff's March 26, 2001 ALJ Hearing Testimony

At the March 26, 2001 ALJ hearing, the ALJ noted that the issue was whether plaintiff was disabled during July 30, 1982, the date of a prior decision unfavorable to plaintiff, to September 30, 1985, when he was last insured for disability insurance benefits.  (AR 101.)

Plaintiff testified that he attended special education classes through the sixth grade level.  (AR 102.)  Plaintiff has never learned to read.  (AR 103.)  Plaintiff served in the U.S. Army during 1968-1970 and worked as a cook.  (AR 105.)  After his Army discharge, plaintiff worked in farm labor and picked fruit.  (AR 106.)  After his farm labor, plaintiff worked at a denim manufacturing plant where he lifted and handled bundles of clothing material.  (AR 106.)  The individual bundles weighed up to 60 pounds.  (AR 107.)  After the bundling job, plaintiff worked delivering furniture and appliances.  (AR 108.)  Plaintiff later returned to his bundling job at the denim manufacturing plant.  (AR 108.)

In 1980, plaintiff hurt his right arm picking up a bundle and felt a strain in his back.  (AR 109, 116.)  Plaintiff left work and received medical treatment.  (AR 110.)  Plaintiff received a shot in his shoulder which did not relieve his symptoms.  (AR 110.)  Plaintiff received treatment at a Tulare County clinic but it did not solve his shoulder problems.  (AR 111.)  Plaintiff later treated at the Veterans Administration Hospital in Fresno.  (AR 111.)  Plaintiff received a needle treatment which deadened the right side of his body.  (AR 112.)  Plaintiff refused a spinal tap dye treatment because he was given a 99 percent chance he would become a quadriplegic, suffer a coma and/or die.  (AR 112.)  Treatment for plaintiff's right shoulder provided no benefit, and his shoulder did not respond to heat treatments.  (AR 117, 119.)

Up to 1985, plaintiff could not do much with his right shoulder.  (AR 117.)  Plaintiff needed assistance with dressing, using the bathroom, and cleaning himself.  (AR 117.)  Plaintiff was unable to drive.  (AR 117.)  Plaintiff was unable to use his right hand until 1987 when a pinched nerve was

discovered in his spine.  (AR 118.)  Cold pack treatment and massage permitted plaintiff to move his right arm.  (AR 120.)

Plaintiff has neither worked nor been able to work since the 1980 injury to his shoulder.  (AR 113.)  Plaintiff is limited to lifting five pounds with this right hand.  (AR 120.)  Plaintiff is able to use his right hand to feed himself.  (AR 120.)  Plaintiff was able to sell bingo tickets at an Am Vet's facility to the extent he did not have to walk or lift anything.  (AR 113-114.)  Plaintiff later noted that he had problems making change and could not do much of anything and was asked to stop helping out at the Am Vet's facility.  (AR 114.)

Plaintiff was first diagnosed with diabetes after he was discharged from the Army.  (AR 115.)  Plaintiff started taking insulin pills in 1979.  (AR 125.)

During 1980-1985, plaintiff experienced no problems walking or sitting.  (AR 122.)  During that time, plaintiff believes he was able to lift or carry up to 15 pounds with both hands.  (AR 122.)  Plaintiff was able to hold a bottle of water without spilling it.  (AR 123.)  Plaintiff could feed himself "to some extent."  (AR 123.)  Plaintiff could not drive and experienced problems dressing, using the lavatory, washing himself and taking a shower.  (AR 123.)  Plaintiff was able to open a door.  (AR 124.)

### *Vocational Expert Cheryl R. Chandler's March 26, 2001 ALJ Hearing Testimony*

Vocational expert Cheryl R. Chandler ("Ms. Chandler") testified at the March 26, 2001 ALJ hearing that plaintiff's bundle handler and janitorial work were medium, unskilled.  (AR 130.)  Ms. Chandler characterized plaintiff's furniture moving work as very heavy, unskilled and his farm labor as medium to light, unskilled.  (AR 130.)

As a first hypothetical, the ALJ asked Ms. Chandler to assume a person who: (1) is age 32-37; (2) has a seventh grade education but illiterate; (3) has plaintiff's past relevant work experience; (4) has a combination of severe impairments to result in a residual functional capacity to lift/carry 50 pounds occasionally and 25 pounds frequently and to stand and walk six to eight hours and to sit six to eight hours; (5) has limited use of the dominant right, upper extremity as a helping hand only; (6) has a severe non-exertional impairment; (7) has retained functional capacity to relate and interact with others, in particular, coworkers, supervisors and general public; (8) has retained capacity to understand, remember and carry out simple, repetitive tasks; (9) retains the ability to maintain persistence and pace; and (10)

1    retains the capacity to adhere to safety rules and to adopt to usual changes in a work setting.  (AR 131.)

2    As to the hypothetical, Ms. Chandler opined that such person could perform neither plaintiff's past work

3    nor jobs that exist in the national economy.  (AR 131.)

4                    ***Dr. Willis' June 15, 2001 ALJ Hearing Testimony***

5            The ALJ reconvened a June 15, 2001 supplemental hearing to obtain Dr. Willis' expert medical

6    testimony and Ms. Chandler's further vocational expert testimony.  (AR 135.)  Dr. Willis noted that she

7    is California certified in neurology and that she had neither personally examined nor tested claimant.

8    (AR 135, 137.)  Dr. Willis noted that she had sufficient objective evidence to form an opinion of

9    plaintiff's medical status up to 1987.  (AR 137.)  Dr. Willis identified plaintiff's objective impairments

10   as insulin dependent diabetes and androgenous obesity.  (AR 138.)  Dr. Willis characterized plaintiff's

11   diabetes as moderate in severity with variable control based on blood sugar management.  (AR 138.)

12   Dr. Willis opined that plaintiff's impairments, either individually or in combination, neither met nor

13   equaled an impairment in the Listing of Impairments.  (AR 139.)  Dr. Willis noted that plaintiff had not

14   complied with recommendations to lose weight.  (AR 139.)  Dr. Willis further noted that pain was

15   possible from diabetic neurology.  (AR 139.)

16           Dr. Willis opined that up to 1987, plaintiff's functional limitations were: (1) lifting with his right

17   hand 25 pounds occasionally and 10 pounds frequently; (2) lifting with both hands 50 pounds

18   occasionally and 25 pounds frequently; (3) moderate restriction to forceful gripping and sustained

19   pushing/pulling with the right upper extremity; (4) avoidance to stand/walk more than four hours or

20   more than two hours without a 15-minute opportunity to sit; (5) avoidance of sustained use of foot

21   pedals requiring forceful pressure for more than three hours a day, 30 minutes at a time; and (6)

22   avoidance of working at heights, climbing ladders or being in a place where loss of footing could cause

23   injury.  (AR 141.)  Dr. Willis estimated plaintiff's right upper extremity limitations for lifting/carrying

24   arose prior to 1980 and plaintiff's leg limitations arose in approximately 1985.  (AR 141.)

25           On examination by plaintiff's counsel, Dr. Willis' noted that she was familiar in passing with

26   adhesive capsulitis or frozen shoulder syndrome.  (AR 146.)  Dr. Willis noted that plaintiff's wearing

27   a sling was "not objective" and "wouldn't prove anything" especially given that EMG and nerve

28   conduction reports fail to support muscle or neuromuscular disease.  (AR 151.)  According to Dr. Willis,

1   wearing a sling accounts for malingering or hysteria.  (AR 152.)

2       Dr. Willis admitted she could not rule out that plaintiff suffered adhesive capsulitis.  (AR 152.)

3   However, based on the records, Dr. Willis concluded that from a neurologic standpoint, there was no

4   objective disease.  (AR 154.)  Dr. Willis is familiar with RSD but is unfamiliar with its limitations on

5   ability to work.  (AR 157, 160.)  According to Dr. Willis, RSD is more within the realm of expertise of

6   rheumatologists than neurologists.  (AR 161.)

7                      ***Ms. Chandler's June 15, 2001 ALJ Testimony***

8       As a first hypothetical, the ALJ asked Ms. Chandler to assume a person who: (1) is age 32-37;

9   (2) has a seventh grade education and past relevant work as Ms. Chandler testified to at the March 26,

10  2001 ALJ hearing; (3) has a combination of severe exertional impairments; (4) retains the residual

11  functional capacity to lift 10 pounds, to carry 15 pounds and to stand, walk and sit eight hours; and (4)

12  is able to hold a glass and/or feed himself with right dominant extremity.  (AR 163.)  Ms. Chandler

13  opined that such person would be able to perform neither plaintiff's past relevant work nor other jobs

14  in the national economy.  (AR 163-164.)

15      As a second hypothetical, the ALJ asked Ms. Chandler to assume a person who: (1) has the same

16  vocational parameters listed in the first hypothetical; (2) has a combination of severe exertional

17  impairments; (3) has residual functional capacity to lift/carry 10 pounds frequently and 15 pounds

18  occasionally, to sit, stand and walk six to eight hours, and to use both hands for eating and dressing; (4)

19  is unable to drive, cook or bathe; and (5) has limited ability to hold objects with respect to dominant

20  right upper extremity. (AR 164.) Ms. Chandler opined that such person would be able to perform neither

21  plaintiff's past relevant work nor other jobs in the national economy.  (AR 164.)

22      As a third hypothetical, the ALJ asked Ms. Chandler to assume a person who: (1) has the same

23  vocational parameters listed in the first hypothetical; (2) has a combination of severe exertional and non-

24  exertional impairments; (3) has residual functional capacity to lift/carry 20 pounds frequently and 10

25  pounds occasionally, to stand, walk and sit eight hours, to occasionally push/pull and engage in fine

26  manipulation with dominant right upper extremity, to occasionally reach above the shoulder with right

27  upper extremity, to understand, remember and carry out simple, repetitive tasks, to maintain persistence

28  and pace, to interact and relate to others, to adapt to usual changes in a work setting, to adhere to safety

25

1   rules, and to maintain regular time and attendance. (AR 165.) Ms. Chandler opined that such person

2   could not perform plaintiff's past relevant work but is able to perform gross handling bilaterally. (AR

3   166.) Ms. Chandler identified jobs which such a person could perform, including food preparation

4   (20,000 jobs in California and 200,000 nationally), agricultural handling (2,300 jobs in California and

5   23,000 nationally), and light farm labor (20,000 positions in California and 200,000 nationally). (AR

6   167-168.)

7          As a fourth hypothetical, the ALJ asked Ms. Chandler to assume a person who: (1) has the same

8   vocational parameters listed in the first hypothetical; (2) has a combination of severe exertional and non-

9   exertional impairments; (3) has residual functional capacity to lift/carry 50 pounds occasionally and 25

10   pounds frequently with both upper extremities and to stand, walk and sit six to eight hours; (4) is able

11   to occasionally forcefully grip, push and pull with the dominant right upper extremity; and (5) is able

12   to understand, remember and carry out simple, repetitive tasks, to relate to and interact with others, to

13   maintain attention and concentration, to maintain persistence and pace, to adapt to usual work setting

14   changes, and to adhere to safety rules. (AR 168.) Ms. Chandler opined that a person with such

15   limitations would be unable to perform plaintiff's past relevant work due to the upper extremity

16   limitation. (AR 169.) Ms. Chandler identified only food preparation work as available for such person.

17   (AR 169-170.)

18          As a hypothetical, plaintiff's attorney asked Ms. Chandler to assume the ALJ's third hypothetical

19   and to add the intellectual and cognitive limitations which Dr. Fishback noted in his earlier report. (AR

20   171.) Ms. Chandler noted problems to maintain attention, concentration, persistence and pace and a

21   "sheltered employment setting." (AR 171, 172.)

22                    ***Plaintiff's September 8, 2003 ALJ Hearing Testimony***

23          Plaintiff testified at the September 8, 2003 ALJ hearing that he attended special education classes

24   where he copied work from the blackboard but was taught nothing. (AR 181.) In junior high school,

25   plaintiff stayed in one classroom with a single teacher and did not attend different classes. (AR 181.)

26   After plaintiff was drafted into the U.S. Army, he completed an eight-week cooking course. (AR 183,

27   184.) In the Army, plaintiff achieved the rank of Specialist IV. (AR 183-184.)

28   / / /

1     ***Medical Expert Allen Hedberg, Ph.D.'s September 8, 2003 ALJ Hearing Testimony***

2          Medical expert Allen Hedberg, Ph.D. ("Dr. Hedberg"), a psychologist, testified at the September

3     8, 2003 ALJ hearing that as to a plus or minus five point test score, a test score ranges five points higher

4     or lower than the recorded score for a 10-point spread. (AR 193.) Dr. Hedberg noted that test scores

5     are corrected as a person ages. (AR 194.) Dr. Hedberg construed Dr. Kleist's Quick Test as a brief

6     screen test or intelligence overview, requiring 10 minutes to administer and having a degree of

7     variability exceeding five points and up to 15 points. (AR 195.) Dr. Hedberg noted that Dr. Kleist's test

8     was developed and designed to rule out mental retardation in mass testing. (AR 202.) Dr. Hedberg

9     opined that Dr. Fishback "over-stretched" his assessment on Kr. Kleit's test results and unfairly

10    "dispelled" Dr. Kleist's test. (AR 196.) Dr. Hedberg characterized Dr. Kleist's test as "valid" and

11    "recognized" and noted that it is "only a screen" or "estimate" of intelligence. (AR 197.) According

12    to Dr. Hedberg, Dr. Fishback dispelled Dr. Kleist test results beyond the variable range which Dr. Kleist

13    had considered. (AR 197.) Dr. Hedberg assessed 85 as the lowest score for Dr. Kleist's test. (AR 197.)

14    Dr. Hedberg admitted that the WAIS III administered by Dr. Fishback is more reliable than Dr. Kleist's

15    test and is a leading test. (AR 203.)

16         Dr. Hedberg defined average intelligence as ability to take and integrate information and to

17    respond to a problem or situation productively, effectively, functionally, reasonably and relevantly. (AR

18    199.) Such a situation includes work, family or school. (AR 199.) Dr. Hedberg explained that a person

19    with borderline intelligence is able to take in information with a stimulus response and with a low level

20    of meaningfulness, practicality or reasonableness but enough to handle the situation in a basic format.

21    (AR 200.) However, Dr. Hedberg noted that a person with borderline intelligence is unable to take in

22    and integrate information "at a high level of abstract thinking." (AR 200.) Dr. Hedberg noted that a

23    mildly retarded person takes in information at a practical stimulus level, responds to a situation

24    immediately with minimal degree of forethought, judgment and comprehension, and acts in a pattern

25    without thinking of best options. (AR 200-201.) According to Dr. Hedberg, the brain stabilizes at age

26    30 and diminishing factors begin. (AR 201.)

27         In reviewing plaintiff's medical records, Dr. Hedberg found no evidence to indicate a diagnosis

28    of mild mental retardation. (AR 207.) Dr. Hedberg assessed plaintiff's IQ at 80, in the high end of

borderline intelligence with normal intelligence being 85. (AR 207-208.) Factors for Dr. Hedberg's assessment include plaintiff's ability to interact and communicate meaningfully with physicians, his two-year military service, fairly good handwriting, meaningful, relevant responses to ALJ questions, and academic records revealing that plaintiff functioned beyond mental retardation. (AR 210-212.) Dr. Hedberg claimed that his IQ assessment is more accurate than Dr. Fishback's because plaintiff's scores were not in the mental retardation range and reflect that plaintiff is able to function at a higher level. (AR 217.)

Dr. Hedberg noted that the medical evidence raised malingering "on several occasions" but was not tested. (AR 208.) Dr. Hedberg considered malingering "a questionable factor" in light of plaintiff's noncompliance and uncooperativeness. (AR 209.) Dr. Hedberg commented on plaintiff's long history of non-compliance as to exercise, diet, lifestyle, medical appointments and referrals. (AR 208.)

Dr. Hedberg opined that based his review of the plaintiff's medical records, plaintiff's condition did not meet section 12.05 (mental retardation) of the Listing of Impairments. (AR 210.) Dr. Hedberg noted that the medical record includes evidence that plaintiff is able to: (1) understand, carry out and remember simple instructions; (2) respond appropriately to supervisors, coworkers and usual work situations; and (3) deal with small changes in a routine work setting. (AR 221-222.)

### Medical Expert Dr. Goka's September 8, 2003 ALJ Hearing Testimony

Dr. Goka, who is certified in physical medicine and rehabilitation, testified at the September 8, 2003 ALJ hearing that he examined plaintiff in May 2003. (AR 225.) Based on his review of plaintiff's medical records, Dr. Goka concluded that during June 1, 1980 to September 1, 1987, plaintiff experienced RSD, better known as Complex Regional Pain Syndrome, which is uncommon and difficult to diagnose with a generally less than five percent cure rate. (AR 225, 226, 236.) Dr. Goka explained that RSD is "purely a clinical diagnosis" with no diagnostic studies and that RSD cannot be ruled out by electromyograms or nerve conduction studies. (AR 226.) Swelling is the biggest clinical finding to support Dr. Goka's RSD diagnosis. (AR 228.) Dr. Goka noted that physical therapy records referred to right upper extremity atrophy up to 1985. (AR 228.) According to Dr. Goka, a minor trauma, such as plaintiff's right shoulder injury from lifting bundles in 1980, may cause RSD. (AR 229-230.) Dr. Goka noted that frozen shoulder differs from RSD in that frozen shoulder limits range of motion. (AR

231.)

Dr. Goka found no evidence from the medical record that plaintiff exaggerated his shoulder symptoms in that physical findings were not disproportionate to pain.  (AR 232.)  Dr. Goka pointed to plaintiff's limited right grip strength results to negate malingering.  (AR 233.)

Dr. Goka opined that as of July 15, 1980, plaintiff would have had minimal ability to use for work his dominant right arm and would have had minimal ability to lift his right arm.  (AR 235.)  Dr. Goka equated minimal to less than five percent of plaintiff's pre-injury ability.  (AR 235.)  Dr. Goka opined that plaintiff would have limited right arm range of motion "like a joystick close to his body" and would have been unable to raise his right arm above his shoulder.  (AR 236.)

### *Vocational Expert Tom Dachelet's September 8, 2003 ALJ Hearing Testimony*

Vocational expert Tom Dachelet ("Mr. Dachelet") testified at that September 8, 2003 ALJ hearing that plaintiff's factory, janitor and farm labor work was medium, unskilled and that his furniture mover work was medium, unskilled.  (AR 242.)  The ALJ asked Mr. Dachelet to assume a hypothetical person who: (1) is age 32-37 during the relevant time; (2) has an eighth grade education and past relevant work similar to plaintiff's; (3) has a combination of severe impairments; (4) retains the residual functional capacity to lift/carry 20 pounds occasionally and 10 pounds frequently; (5) retains ability to stand/walk eight hours; (6) retains ability to sit eight hours; (7) is able to occasionally push/pull and engage in fine manipulation with the dominant right upper extremity (but is unable use the extremity repetitively or constantly); (8) retains ability to occasionally reach over the shoulder with right upper extremity; (9) retains the ability and residual functional capacity to understand, remember and carry out simple, repetitive tasks; (10) retains ability to maintain attention, concentration, persistence and pace; (11) retains ability to interact and relate to others; (12) retains ability to adapt to usual changes in work settings and to adhere to safety rules; and (13) retains ability to maintain regular time and attendance.  (AR 242-243.)  Mr. Dachelet opined that such person is unable to perform plaintiff's past jobs or any work in the national economy and including sedentary or light, unskilled work.  (AR 243, 244.)

### **The ALJ's Findings**

In his October 29, 2003 decision, the ALJ identified the "general issue" whether plaintiff was disabled from June 13, 1980, plaintiff's alleged onset date, through September 1, 1987, when he was

1   found disabled for SSI.  (AR 26.)  The ALJ noted that although June 13, 1980 to September 1, 1987 "is

2   the period being adjudicated, *the claimant's insured status for Disability Insurance Benefits expired on*

3   *September 30, 1985*, and that date must be kept in mind as well because the claimant first carries the

4   burden to show that he was disabled before that date for Disability Insurance Benefits."  (AR 26; italics

5   in original.)   As such, the ALJ identified "specific issues" whether during the adjudicated period,

6   plaintiff had severe, medically determinable physical or mental impairment(s) to render plaintiff unable

7   to engage in substantial gainful activity, whether such impairment(s) could have been expected to result

8   in death or last not less than 12 continuous months, and if plaintiff was disabled, when disability began.

9   (AR 26.)

10          In concluding that during the adjudicated period, plaintiff was not disabled, the ALJ found:

11   1.      Plaintiff had a medically severe combination of impairments diagnosed as right

12          (dominant) upper extremity RSD, autonomic dystrophy with second degree adhesive

13          capsulitis, chronic right shoulder sprain, arthritis, bicipital tendinitis, subdeltoid bursitis

14          and/or calcific tendinitis of the right shoulder, frozen right shoulder, severe insulin

15          dependent diabetes mellitus since 1980, Dysthymic disorder, overlaying anxiety,

16          conversion disorder, developmental reading disorder, atypical somatoform disorder,

17          chronic depressive disorder, obesity, mild bronchitis, superficial laceration of right

18          thumb, and hearing loss but lacked an impairment or combination of impairments listed

19          in or medically equal to one listed in the Listing of Impairments.

20   2.      During the adjudicated period, plaintiff: (1) retained the residual functional capacity to

21          perform the exertional and nonexertional demands of an eight-hour work day; (2) was

22          able to understand, remember and carry out simple repetitive tasks, to maintain

23          persistence and pace, to interact and relate with others, to adapt to usual changes in a

24          work setting,  to adhere to safety rules, and to maintain regular time and attendance; (3)

25          was able to sit, stand and walk in an eight-hour work day; (4) needed to avoid

26          lifting/carrying more than 20 pounds occasionally and 10 pounds occasionally, more than

27          occasional pushing and pulling, more than occasional fine finger manipulation with the

28          dominant right hand, and more than occasional reaching over the shoulder with the right

1      upper extremity; and (5) had no further exertional or nonexertional restrictions.

2      3.      To the extent that plaintiff alleged debilitating exertional or nonexertional restrictions,

3              symptoms or functional limitations which would foreclose work within the above

4              residual functional capacity, such allegations were not credible.

5      4.      Plaintiff did not retain the residual functional capacity to perform his past relevant work.

6      5.      If during the period adjudicated, plaintiff retained the residual functional capacity to

7              perform the full range of light or sedentary work, Rules 202.16 and 201.23 of the

8              Medical-Vocational Guidelines, 20 C.F.R., Part 404, Subpart P, Appendix 2 ("Medical-

9              Vocational Guidelines"), direct findings of not disabled.

10     6.      Considering the combined exertional and nonexertional impact of plaintiff's impairment

11             related symptoms and March 26, 2001 vocational expert testimony, the occupational job

12             base, although diminished, remained substantially intact during the period adjudicated

13             and there were a significant number of jobs in the national economy which plaintiff could

14             have performed.  (AR 37.)

15                                          **DISCUSSION**

16                                     **Standard Of Review**

17     Congress has provided limited judicial review of a Commissioner's decision made through an

18     ALJ.  *See* 42 U.S.C. § 405(g).  A court must uphold the Commissioner's decision, made through an ALJ,

19     when the determination is not based on legal error and is supported by substantial evidence.  *See Jones*

20     *v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985); *Sanchez v. Secretary of Health & Human Services*, 812

21     F.2d 509, 510 (9th Cir. 1987) (two consulting physicians found applicant could perform light work

22     contrary to treating physician's findings).[1]  Substantial evidence is "more than a mere scintilla,"

23     *Richardson v. Perales*, 402 U.S. 389, 402, 91 S.Ct. 1420 (1971), but less than a preponderance,

24     *Sorenson v. Weinberger*, 514 F.2d 1112, 1119, n. 10 (9th Cir. 1975).  Substantial evidence "means such

25     evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson*, 402 U.S.

26     ─────────────────

27         [1]      "The district court properly affirms the Commissioner's decision denying benefits if it is supported by
       substantial evidence and based on the application of correct legal standards."  *Sandgathe v. Chater*, 108 F.3d 978, 980 (9th
28     Cir. 1997).

1    at 401, 91 S.Ct. 1420; *Sandgathe*, 108 F.3d at 980.

2         The record as a whole must be considered, weighing both the evidence that supports and detracts

3    from the Commissioner's conclusion.  *Sandgathe*, 108 F.3d at 980; *Jones,* 760 F.2d at 995.  If there is

4    substantial evidence to support the administrative finding, or if there is conflicting evidence that will

5    support a finding of either disability or nondisability, the finding of the Commissioner is conclusive.

6    *Sprague v. Bowen*, 812 F.2d 1226, 1229-1230 (9ᵗʰ Cir. 1987).  If the evidence is susceptible to more than

7    one rational interpretation, the court may not substitute its judgment for that of the Commissioner.

8    *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9ᵗʰ Cir. 1999); *Morgan v. Commissioner*, 169 F.3d 595, 599 (9ᵗʰ

9    Cir. 1999).

10        This Court reviews the ALJ's decision pursuant to 42 U.S.C. § 405(g) to determine whether it

11   is: (1) based on proper legal standards; and (2) supported by substantial evidence in the record as a

12   whole.  *Copeland v. Bowen*, 861 F.2d 536, 538 (9ᵗʰ Cir. 1988).  "A decision of the ALJ will not be

13   reversed for errors that are harmless."  *Burch v. Barnhart*, 400 F.3d 676, 679 (9ᵗʰ Cir. 2005).

14        Plaintiff bears the burden to prove that he is disabled which requires presentation of "complete

15   and detailed objective medical reports of [his] condition from licensed medical professionals."  *Meanel*

16   *v. Apfel*, 172 F.3d 1111, 1113 (9ᵗʰ Cir. 1999) (citing 20 C.F.R. §§ 404.1512(a)-(b), 404.1513(d)).

17   Plaintiff must furnish medical and other evidence about plaintiff's medical impairments.  20 C.F.R. §§

18   404.1512(a), 416.912(a); ("[Y]ou must bring to our attention everything that shows that you are blind

19   or disabled."); 20 C.F.R. §§ 404.1514, 416.914 ("We need specific medical evidence to determine

20   whether you are disabled or blind.  You are responsible for providing that evidence.")

21        Here, plaintiff claims disability during the adjudicated period June 13, 1980 to September 1,

22   1987, primarily due to right shoulder and mental problems.  As discussed below, this Court finds that

23   the ALJ properly evaluated the evidence and that his conclusion that plaintiff was not disabled during

24   the adjudicated period is based on proper legal standards and substantial evidence.

25        With the above standards in mind, this Court turns to plaintiff's criticism of the ALJ's October

26   29, 2003 decision.

27                    **Dr. Fishback's IQ Assessment**

28        Plaintiff contends that the ALJ improperly rejected Dr. Fishback's assessment of plaintiff's IQ.

1  The Commissioner disagrees.

2      Section 12.05 of the Listing of Impairments notes that mental retardation "refers to significantly

3  subaverage general intellectual functioning with deficits in adaptive functioning."  Under section 12.05,

4  the required level of severity for mental retardation is met with:

5          C.  A valid verbal, performance, or full IQ of 60 through 70 and a physical or
          other mental impairment imposing an additional and significant work-related limitation
6          of function;

7      OR

8          D.  A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at
          least two of the following:
9
             1.  Marked restriction of activities of daily living; or
10
             2.  Marked difficulties in maintaining social functioning; or
11
             3.  Marked difficulties in maintaining concentration, persistence or pace . . .
12

13      Section 12.00 D.6.a. of the Listing of Impairments addresses intelligence tests and notes that

14  standardized intelligence test results "may provide data that help verify the presence of mental

15  retardation or organic mental disorder, as well as the extent of any compromise in cognitive

16  functioning."  Section 12.00 D.6.a. requires evaluation "whether IQ scores are considered valid and

17  consistent with the developmental history and the degree of functional limitation."  According to Section

18  12.00 D.6.b., standardized intelligence test results "are essential to the adjudication of all cases of mental

19  retardation" other than subject to section 12.05A. (not at issue here).  Section 12.00 D.6.d. prefers "use

20  of IQ measures that are wide in scope and include items that test both verbal and performance abilities."

21      To recap, plaintiff's counsel retained Dr. Fishback who assessed plaintiff a 74 Verbal IQ, 73

22  Performance IQ and 71 Full-Scale IQ based on WAIS III. (AR  1018.)  "[W]orking retroactively, Dr.

23  Fishback surmised that plaintiff's 2001 IQ score of 71 "should be very consistent with his in 1980-1987

24  IQ score." (AR 1105.)  Dr. Fishback reasoned that given plaintiff's "very serious deficits in daily living

25  skills, communication skills, social skills, concentration, persistence, and pace of completing tasks, it

26  appears very reasonable to place his IQ at the lower end of its 68 to 76 range, i.e., squarely at the mild

27  mentally-retarded level." (AR 1109.)  Nonetheless, Dr. Fishback admitted that "the literal IQ criteria

28  of 12.05 (D) is not met." (AR 1109.)

1   Dr. Hedberg disagreed with Dr. Fishback's evaluation. Dr. Hedberg opined that Dr. Fishback

2   "over-stretched" his assessment of Dr. Kleist's Quick Test results and unfairly "dispelled" the results

3   beyond the variable range for which Dr. Kleist accounted. (AR 196, 197.) In reviewing plaintiff's

4   medical records, Dr. Hedberg found no evidence to indicate a diagnosis of mild mental retardation. (AR

5   207.) Dr. Hedberg assessed plaintiff's IQ at 80, in the high end of borderline intelligence with normal

6   intelligence being 85. (AR 207-208.) Factors for Dr. Hedberg's assessment include plaintiff's ability

7   to interact and communicate meaningfully with physicians, his two-year military service, fairly good

8   handwriting, meaningful, relevant responses to ALJ questions, and academic records revealing that

9   plaintiff functioned beyond mental retardation. (AR 210-212.) Dr. Hedberg claimed that his IQ

10  assessment is more accurate than Dr. Fishback's because plaintiff's scores were not in the mental

11  retardation range and reflect that plaintiff is able to function at a higher level. (AR 217.)

12  Dr. Hedberg opined that based his review of the plaintiff's medical records, plaintiff's condition

13  did not meet section 12.05 of the Listing of Impairments. (AR 210.) Dr. Hedberg noted that the medical

14  record includes evidence that plaintiff is able to: (1) understand, carry out and remember simple

15  instructions; (2) respond appropriately to supervisors, coworkers and usual work situations; and (3) deal

16  with small changes in a routine work setting. (AR 221-222.)

17  The ALJ rejected Dr. Fishback's assessment that plaintiff's mental impairment met section 12.05

18  D.'s criteria:

19      Indeed, Dr. Fishback admits that "the literal IQ criteria of 12.05(D) **is not met** (emphasis
        mine [ALJ]) (*see also*, Medical Expert Hedberg's testimony). Furthermore I find it

20      highly significant that Psychologist Fishback *interviewed the claimant's wife on June 27,
        2003*, as opposed to interviewing the claimant again, before he produced his

21      supplemental report to the March 13, 2001 report (file 4 or 4 Exhibit 40). His self-
        described report dated July 5, 2003, is a "Supplement to Brief Cognitive Evaluation," and

22      therein he states, among other things, that "all reports document deficits either around
        1981 *or within about the last three years*" (emphasis mine [ALJ].) The latter period, is

23      of course, well outside the period in question here and the report itself or key statements
        therein are either controverted by Medical Expert Hedberg or simply too equivocal to

24      provide meaningful help in resolving the critical issues in this case. (AR 32.)

25  Noting the "conflicting evidence at various points in this voluminous medical record," the ALJ

26  pointed out that Dr. Hedberg's "testimony controverts the conclusions of Dr. Fishback and puts in

27  context the opinions of others." (AR 31.) The ALJ found the opinion of Dr. Kleist "is substantially

28  consistent with the opinion of Medical Expert Hedberg and that he took it into account in rendering his

1   own opinion.  Likewise, the opinion of Treating Psychiatrist Blasquez, regarding the nature and severity

2   of the claimant's impairments and how they impacted the claimant's residual functional capacity and

3   credibility, are addressed in the testimony of Medical Expert Hedberg."  (AR 32.)  The ALJ concluded

4   the Dr. Hedberg's testimony "was properly focused on the period in question and it has greatly assisted

5   me because it helped resolve the conflicting medical opinions and it clarified and resolved discrepancies

6   regarding the nature and severity of the claimant's mental impairment and his 'mental residual functional

7   capacity' during the period in question."  (AR 32.)

8        "[T]he ALJ is responsible for determining credibility, resolving conflicts in the medical

9   testimony, and for resolving ambiguities."  *Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

10   "Where evidence is susceptible of more than one rational interpretation, it is the ALJ's conclusion which

11   must be upheld."  *Sample v. Schweiker*, 694 F.2d 639, 641 (9th Cir. 1982).  In reaching his findings, an

12   ALJ "is entitled to draw inferences logically flowing from the evidence."  *Sample*, 694 F.2d at 641.  An

13   ALJ "need not substitute the judgment of expert witnesses for his own."  *Sample*, 694 F.2d at 642.

14        The ALJ noted the conflicts among Dr. Fishback and other medical experts and exercised his

15   responsibility to resolve the conflicts.  The medical opinions gave rise to multiple interpretations of

16   plaintiff's IQ and mental condition during the adjudicated period.  This Court is not in a position to

17   override the ALJ's interpretation of the medical evidence and testimony.  The ALJ was not required to

18   substitute Dr. Fishback's judgment for the ALJ's.

19        Plaintiff criticizes the ALJ' reliance on Dr. Hedberg, a non-examining psychologist, as compared

20   to Dr. Fishback, a consultative examining psychologist retained by plaintiff's counsel.  The Ninth Circuit

21   Court of Appeals distinguishes opinions among physicians who treat claimants (treating physicians),

22   who examine but do not treat claimants (examining physicians), and who neither treat nor examine

23   claimants (nonexamining physicians). *Lester v. Chater*, 81 F.3d 821, 839 (9th Cir. 1995).  "And like the

24   opinion of a treating doctor, the opinion of an examining doctor, even if contradicted by another doctor,

25   can only be rejected for specific and legitimate reasons that are supported by substantial evidence in the

26   record."  *Lester*, 81 F.3d at 830.  An ALJ may meet his obligation to set forth specific, legitimate reasons

27   based on substantial evidence in the record "by setting out a detailed and thorough summary of the facts

28   and conflicting clinical evidence, stating his interpretation thereof, and making findings."  *Magallanes*

*v. Bowen*, 881 F.2d 747, 753 (9th Cir. 1989); *Cotten v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986).  "The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct."  *Embrey v. Bowen*, 849 F.2d 418, 421-422 (9th Cir. 1988). When a physician's opinion is contradicted, "and the opinion of a nontreating source is based on independent clinical findings that differ from those of the treating physician, the opinion of the nontreating source may itself be substantial evidence; it is then the province of the ALJ to resolve the conflict."  *Andrews v. Shalala*, 53 F.3d 1035, 1041 (9th Cir. 1995).

The ALJ set out a detailed and thorough summary of the facts, medical record and opinions, and testimony, stated his interpretation thereof, and made findings as discussed above. (AR 24-25, 27-33.) The ALJ was faced with accepting the assessment of Dr. Fishback or the opinions of Dr. Hedberg and others.  The ALJ disfavored Dr. Fishback's assessment and provided specific, legitimate reasons to do so.  Although plaintiff raises good points, those points address the differences of opinion which the ALJ resolved and which this Court will not second guess.

### Plaintiff's Credibility As To His Right Shoulder

Plaintiff argues that the ALJ "improperly rejected" plaintiff's testimony regarding "severity of the problems with his right shoulder."  Plaintiff points to his testimony to the effect that he was unable to use his right dominant arm during 1981-1987 and had kept his arm in a sling.  The Commissioner contends that the ALJ properly discounted plaintiff's subjective complaints of excess pain and disabling right shoulder symptoms.

"Credibility determinations are the province of the ALJ."  *Fair v. Bowen*, 885 F.2d 597, 604 (9th Cir. 1989); *Russell v. Bowen*, 856 F.2d 81, 83 (9th Cir. 1988).  "An ALJ cannot be required to believe every allegation of disabling pain."  *Fair*, 885 F.2d at 603. An ALJ "may disregard unsupported, self-serving statements."  *Flaten v. Secretary of Health & Human Services*, 44 F.3d 1453, 1464 (9th Cir. 1995).

A claimant bears an initial burden to "produce objective medical evidence of underlying 'impairment,' and must show that the impairment, or a combination of impairments, 'could reasonably be expected to produce pain or other symptoms.'"  *Baston v. Commissioner of Social Security Admin.*, 359 F.3d 1190, 1196 (9th Cir. 2004) (quoting *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996)).  If

1   a claimant satisfies such initial burden and "if the ALJ's credibility analysis of the claimant's testimony

2   shows no malingering, then the ALJ may reject the claimant's testimony about severity of symptoms

3   with 'specific findings stating clear and convincing reasons for doing so.'" *Baston*, 359 F.3d at 1196

4   (quoting *Smolen*, 80 F.3d at 1284.)  "If the ALJ finds that the claimant's testimony as to the severity of

5   her pain and impairments is unreliable, the ALJ must make a credibility determination with findings

6   sufficiently specific to permit the court to conclude that the ALJ did not arbitrarily discredit claimant's

7   testimony." *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002).

8       If an ALJ's credibility finding is supported by substantial evidence in the record, a reviewing

9   court may not engage in second-guessing. *Thomas*, 278 F.3d at 959.  A reviewing court will not reverse

10  an ALJ's credibility determinations "based on contradictory or ambiguous evidence."  *Johnson v.*

11  *Shalala*, 60 F.3d 1428, 1434 (9th Cir. 1995) (citing *Allen v. Heckler*, 749 F.2d 577, 579 (9th Cir. 1984)).

12  "So long as the adjudicator makes specific findings that are supported by the record, the adjudicator may

13  discredit the claimant's allegations based on inconsistencies in the testimony or on relevant character

14  evidence." *Bunnell v. Sullivan*, 947 F.2d 341, 346 (9th Cir. 1991).  Moreover, "the ALJ is entitled to

15  draw inferences 'logically flowing from the evidence.'" *Macri v. Chater*, 93 F.3d 540, 544 (9th Cir.

16  1996) (quoting *Sample*, 694 F.2d at 642).

17      In *Light v. Social Sec. Admin.*, 119 F.3d 789, 792 (9th Cir. 1997), the Ninth Circuit commented:

18      In weighing a claimant's credibility, the ALJ may consider his reputation for truthfulness,
        inconsistencies either in his testimony or between his testimony and his conduct, his

19      daily activities, his work record, and testimony from physicians and third parties
        concerning the nature, severity, and effect of the symptoms of which he complains.

20      *Smolen*, 80 F.3d at 1284; *Moncada v. Chater*, 60 F.3d 521, 524 (9th Cir. 1995) (quoting
        *Orteza v. Shalala*, 50 F.3d 748, 749-50 (9th Cir. 1995)); 20 C.F.R. § 404.1529(c).  An

21      ALJ's finding that a claimant generally lacked credibility is permissible basis to reject
        excess pain testimony.

22

23  *See also* S.S.R. 96-7p.[2]

24  ─────────────────

25      [2]    Social Security Ruling 96-7p sets out factors to assess a claimant's credibility: (1)  claimant's daily
        activities; (2) location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) factors that precipitate

26  and aggravate the symptoms; (4) type, dosage, effectiveness, and side effects of any medication the claimant takes or has
        taken to alleviate pain or other symptoms; (5) treatment, other than medication, the claimant receives or has received for relief

27  of pain or other symptoms; (6) measures other than treatment the individual uses or has used to relieve pain or other
        symptoms (e.g., lying flat on his or her back, standing 15 to 20 minutes every hour, or sleeping on a board); and (7) any other

28  factors concerning the individual's functional limitations and restrictions due to pain or other symptoms.

An ALJ may consider the following factors to determine the credibility of a claimant's allegations of disabling pain:

    1.     The nature, location, onset, duration, frequency, radiation, and intensity of any pain;

    2.     Precipitating and aggravating factors (e.g., movement, activity, environmental conditions);

    3.     Type, dosage, effectiveness, and adverse side-effects of pain medication;

    4.     Treatment, other than medication, for pain relief;

    5.     Functional restrictions;

    6.     Claimant's daily activities;

    7.     Unexplained, or inadequately explained, failure to seek treatment or to follow up a prescribed course of treatment; and

    8.     Ordinary techniques to test a claimant's credibility.

*Bunnell*, 947 F.2d at 346; *see* 20 C.F.R. §§ 404.1529, 416.929.

After detailing plaintiff's testimony, the ALJ thoroughly addressed plaintiff's credibility (AR27-29):

> To the extent the claimant alleged debilitating exertional and nonexertional restrictions, symptoms or functional limitations which would foreclose work within the residual functional capacity [found by the ALJ], those allegations were not credible . . . and were given little weight. The claimant's testimony over the course of his claim for disability benefits has been wildly inconsistent. For example, he testified that could not drive after previously testifying that he drove regularly and without difficulty. The claimant testified, for example, that he had physical therapy for about three or four years, three to four times per week, which is a wild exaggeration. The claimant testified, in pertinent part, that since his injury he has not been able to do any work of any kind. That is not accurate or truthful (e.g., file 2 of 4 Exhibit 11, p. 2; file 4 of 4 Exhibits 30, pp. 1, 3; 31, p. 4). Moreover, at one point, he joined AMVETS Lodge and he sold tickets at their bingo games (e.g., file 4 of 4 Exhibit 42). He remembered having problems making change as he walked around selling the paper cards, he said. He acknowledged that he was not having problems with his legs or his other arm *or any other problem* during the period adjudicated. And yet the claimant initially alleged an inability to work due to diabetes mellitus, problems with his feet, problems with his right arm, and pinched nerve. Thus, inconsistencies abound. I have accepted the credible testimony regarding the claimant's physical limitations and associated symptoms and I have factored those credible limitations into his established residual functional capacity, but I have not accepted his testimony that was inconsistent with the residual functional capacity assessment [of the ALJ]. (AR 34.)

Of key importance, the ALJ accepted plaintiff's claims in part and rejected "exaggerated inability" and claims inconsistent with the ALJ's residual functional capacity assessment. The ALJ

38

pointed to multiple inconsistencies in plaintiff's testimony to support unreliability of plaintiff's claims as to severity of pain and impairments.  The ALJ's credibility findings are sufficiently specific to negate a conclusion that the ALJ arbitrarily discredited plaintiff.  The ALJ noted the absence of evidence that an arm sling was prescribed or of the duration of such prescription.  (AR 28.)  The ALJ properly noted that Dr. Hedberg raised the issue of malingering which had not been tested.  (AR 30.)

The record reveals further grounds to question plaintiff's credibility as to the severity of his impairments during the adjudicated period.  Prior ALJ decisions found plaintiff's subjective complaints not credible and exaggerated.  (AR 1003, 1004, 1073.)  An August 12, 1980 electromyogram of plaintiff's right arm was normal.  (AR 654.)  September 10, 1980 notes attribute a physical therapist to report that plaintiff complained of less pain, had increased range of motion, and was "functionally" better.  (AR 647.)  September 11, 1980 x-rays of plaintiff's right shoulder revealed a minor degenerative condition but otherwise unremarkable.  (AR 329.)  September 11, 1980 notes indicate that plaintiff was never diagnosed with inability to work and to use a sling.  (AR 309, 728.)  September 23, 1980 x-rays of plaintiff's right shoulder revealed neither gross fracture, dislocation nor other traumatic derangement. (AR 328.)  October 17, 1980 x-rays of plaintiff's right shoulder revealed no evidence of calcific tendinitis.  (AR 334.)  November 18, 1980 x-rays of plaintiff's right shoulder revealed no abnormality. (AR 334.)

February 6, 1981 right shoulder x-rays were negative and unremarkable.  (AR 650, 652.)  An April 2, 1981 nerve conduction study of plaintiff's right upper extremity suggested mild compressive neuropathy.  (AR 335.)  An April 2, 1981 electromyographic study of plaintiff's right upper extremity was normal.  (AR 335, 705, 801.)  April 2, 1981 notes reflect an absence of "definitive evidence" of radiculopathy or peripheral neuropathy.  (AR 296, 802.)  An April 2, 1981 nerve conduction velocity study revealed mild slowing of conduction of the right ulnar nerve about the elbow.  (AR 705.)  July 6, 1981 notes indicate decreased pain.  (AR 321, 800.)  July 20, 1981 notes reflect plaintiff's twice a week physical therapy.  (AR 709.)  As of August 31, 1981, plaintiff did not attend physical therapy.  (AR 797, 798.)  December 2, 1981 notes reflect "some fixation of symptoms."  (AR 792.)

A February 22, 1982 electromyographic study of plaintiff's right upper extremity was normal. (AR 663.)  March 29, 1982 physical therapy notes recommended that plaintiff "work through some

pain." (AR 779.)  June 3, 1982 physical therapy notes reflect that plaintiff had 19 physical therapy

treatments during March 5, 1982 and May 10, 1982. (AR 773.)  On May 18, 1982, a treating physician

concluded that plaintiff's "self-inflicted disuse" and over-assistance of his wife are "making an invalid

out of him." (AR 362.)  The physician recommended that plaintiff "get rid of his sling, totally and

completely" and explained:

> He obviously could have a good right upper extremity, if he was willing to rehabilitate
> himself. By this, I mean, he must use his hand. . . . This man must be encouraged to use
> his hand continuously.  If he will get rid of the sling and use the hand there is every
> reason to feel that he will return essentially to normal. (AR 362.)

May 13, 1983 right shoulder x-rays revealed neither evidence of fractures nor calcific densities

adjacent to the right shoulder joint. (AR 603.)  On May 13, 1983, plaintiff acknowledged his shoulder

problem is probably "in my head." (AR 586.)  According to October 29, 1985 notes, plaintiff had

recently started as a window washer. (AR 518.)  Notes reflect that during 1987, plaintiff was in no

apparent distress. (AR 468, 474, 476, 478, 485, 487, 489, 491, 492, 493, 494-496.)

Dr. Schommer's November 4, 1987 examination revealed full range of motion in plaintiff's

upper extremities bilaterally. (AR 739.)  Dr. Schommer questioned whether plaintiff malingered. (AR

740.)

In his October 9, 1981 Request for Hearing, plaintiff acknowledged attempts to find work. (AR

280, 281.)  In a 1987 Disability Report, plaintiff noted his activities of lawn mowing and driving a car.

(AR 437.)  In a November 1987 Vocational Report, plaintiff noted his attempts to find work. (AR 449.)

At the July 30, 1998 ALJ hearing, plaintiff testified that he drove during 1980-1985 without problem.

(AR 88.)  In a September 1994 Disability Report, plaintiff claimed he could lift only two pounds and

noted that he drives a car. (AR 422.)  In an undated Disability Report, plaintiff noted his activities

included cooking and cleaning daily, shopping three times a week, fishing and driving a car. (AR 431.)

At the March 26, 2001 ALJ hearing, plaintiff claimed he neither worked nor has been able to work since

his 1980 shoulder injury despite references in the record that he worked as a window washer and applied

for work. (AR 113.)  Plaintiff further testified that he was unable to use his right hand until 1987 when

a pinched nerve was discovered in his spine. (AR 118.)  Plaintiff acknowledged that during 1980-1985,

he experienced not problems walking or sitting. (AR 122.)  During that time, plaintiff believes he was

1   able to lift or carry up to 15 pounds with both hands.  (AR 123.)  Plaintiff denied ability to drive despite

2   his prior testimony and statements that he was able to drive.  (AR 124.)

3       Plaintiff repeatedly indicated he felt well and had no complaints.  (AR 491, 521, 563, 583.)

4   Plaintiff was consistently noncompliant with his regimented diet to address his diabetes mellitus.  (AR

5   139, 520, 527, 737, 786, 802.)

6       Substantial evidence supports the ALJ's specific findings on plaintiff's credibility to preclude

7   this Court to second guess the ALJ.  Plaintiff fails to demonstrate error in the ALJ's evaluation of

8   plaintiff's credibility.

9   ### **Vocational Expert Testimony**

10      Plaintiff challenges the ALJ's third hypothetical to Ms. Chandler at the June 15, 2001 hearing

11  and the ALJ's reliance on it.  Plaintiff argues that the hypothetical improperly presumed ability to raise

12  the right arm above shoulder level and to push, pull and engage in fine manipulation with the dominant

13  right extremity. The Commissioner responds that the hypothetical was proper.

14      In the final step of the five-step disability evaluation, the Commissioner has the burden to show,

15  in light of a claimant's residual functional capacity, he/she can engage in other substantial gainful work

16  that exists in the national economy.  *Osenbrock v. Apfel*, 240 F.3d 1157, 1162 (9th Cir. 2001).  The

17  Commissioner "can meet this burden by propounding to a vocational expert a hypothetical that reflects

18  all the claimant's limitations."  *Roberts v. Shalala*, 66 F.3d 179, 184 (9th Cir. 1995), *cert. denied*, 517

19  U.S. 1122, 116 S.Ct. 1356 (1996).  Alternatively, the Commissioner can refer to the Medical-Vocational

20  Guidelines.  *Osenbrock*, 240 F.3d at 1162.

21      An ALJ may properly "limit a hypothetical to those impairments that are supported by substantial

22  evidence in the record."  *Osenbrock*, 240 F.3d at 1165.  An ALJ may so limit a hypothetical even when

23  medical evidence conflicts.  *Magallanes*, 881 F.2d at 756.  "An ALJ is free to accept or reject restrictions

24  in a hypothetical question that are not supported by substantial evidence."  *Osenbrock*, 240 F.3d at 1165;

25  *see Magallanes*, 881 F.2d at 756-757.  "Although the hypothetical may be based on evidence which is

26  disputed, the assumptions in the hypothetical must be supported by the record."  *Andrews*, 53 F.3d at

27  1043.  The parameters of an ALJ's hypotheticals need not "include any alleged impairments that the ALJ

28  has rejected as untrue."  *Long v. Chater*, 108 F.3d 185, 188 (8th Cir. 1997).  An ALJ is not bound to

accept restrictions in a hypothetical question of claimant's counsel. *Martinez v. Heckler*, 807 F.2d 771, 773 (9th Cir. 1986).

As noted by the Commissioner, the third hypothetical did not ask Ms. Chandler to assume an unrestricted ability to raise the right arm or to push, pull and engage in fine manipulation. The ALJ asked Ms. Chandler to assume ability to "occasionally push and pull and engage in fine manipulation with the dominant right upper extremity" and to "occasionally reach above the shoulder with the right upper extremity." (AR 165.) The Commissioner points out that the ALJ relied on 1981 Disability Determination Service findings that plaintiff retained the residual functional capacity to perform light work involving occasional pushing, pulling, fine manipulation and over-shoulder reaching with right upper extremity. (AR 1069.) The Commissioner further points out that the ALJ imposed greater limitations as to plaintiff's right upper extremity than proposed by Dr. Willis. (AR 34.) Dr. Willis placed a limitation of lifting 25 pounds occasionally and 10 pounds frequently with the right hand and moderate restriction on forceful gripping and sustained pushing or pulling of the right upper extremity. (AR 1046.)

The ALJ's reliance on non-examining physicians is not by itself improper. A non-examining physician's findings "can amount to substantial evidence, so long as other evidence in the record supports those findings." *Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996), *cert. denied*, 519 U.S. 1113, 117 S.Ct. 953 (1997). When "an opinion of a nontreating source is based on independent clinical findings that differ from those of a treating physician, the opinion of the nontreating source may itself be substantial evidence; it is solely the province of the ALJ to resolve the conflict." *Andrews*, 53 F.3d at 1041. Moreover, "[i]t is not necessary to agree with everything an expert witness says in order to hold that his testimony contains 'substantial evidence.'" *Russell*, 856 F.2d 81, 83 (9th Cir. 1988).

To support their opinions, Dr. Willis and the state agency physician reviewed the medical record, which revealed normal findings as to plaintiff's right shoulder and which this Court detailed above and need not repeat here. As to plaintiff's shoulder, the ALJ limited the third hypothetical to Ms. Chandler to impairments supported by substantial evidence, despite conflicts in the medical record. The ALJ properly exercised his discretion as to the hypothetical which, as noted by the Commissioner, was further supported by Dr. Schommer's assessment.

In passing, plaintiff claims that the third hypothetical to Ms. Chandler failed to consider non-exertional impairments identified by Dr. Kleist, Dr. Blasquez and Dr. Fishback and that a primary grounds for the Appeals Council remand was further testimony. With its March 26, 2003 order, the Appeals Council on remand directed the ALJ, among other things, to clarify the nature and severity of plaintiff's impairments and to help resolve the discrepancy in the medical opinions. (AR 1082-1083.) Plaintiff fails to demonstrate noncompliance with the remand order arising from the hypothetical or that the hypothetical should have included greater non-exertional limitations. Plaintiff demonstrates no reversible error as to the third hypothetical to Ms. Chandler.

### Mr. Dachelet's Testimony

Plaintiff criticizes the ALJ's rejection of Mr. Dachelet's testimony that there were no jobs plaintiff was capable to perform and the ALJ's assessment that Mr. Dachelet was influenced by Dr. Goka. The Commissioner responds that the ALJ was empowered to discount Mr. Dachelet's testimony.

The ALJ rejected Dr. Dachelet's testimony:

> Dr. Goka's testimony focused almost entirely on the claimant's physical capacity, which was not really the subject of the Appeals Council Remand Order. . . . Indeed, the claimant's physical capacity during the period in question has been adjudicated and basically settled in this long running case. Moreover, since Mr. Dachelet's testimony was unduly influenced and focused on the claimant's physical residual functional capacity as opposed to changes, if any, in his mental residual functional capacity *(Mr. Dachelet's testimony followed immediately after Dr. Goka)*, it is given little or no weight in this instance. In fact, Vocational Expert Dachelet's testimony is directly controverted by the expert vocational testimony offered at the previous hearing held on March 26, 2001, *i.e.,* the testimony of Vocational Expert Cheryl Chandler (*see e.g.,* file 4 of 4 Exhibit 51, pp. 4, 14, 16). Since the claimant's *physical residual functional capacity* has remained unchanged during the period in question based on the overwhelming preponderance of the evidence in the record, it would be imprudent and improper to give substantial weight to Vocational Expert Dachelet's testimony over that of Vocational Expert Chandler without good reason for doing so. I do not have one and the fact that one expert's testimony is more recent than another's is clearly not one. (AR 25.)

At step five of the disability evaluation here, the ALJ relied on Ms. Chandler's testimony and the Medical-Vocational Guidelines to satisfy the burden to prove availability of existing jobs. (AR 35, 37.) The Appeals Council's March 26, 2003 order neither mandated further vocational expert testimony nor invalidated the third hypothetical to Ms. Chandler. Nonetheless, the ALJ obtained Mr. Dachelet's testimony, and the weight given to his testimony rests within the ALJ's province. *See Gomez v. Chater*, 74 F.3d 967, 971 (9th Cir.), *cert. denied*, 519 U.S. 881, 117 S.Ct. 209 (1996). The ALJ satisfied the

1   Appeals Council remand order and confirmed application of the third hypothetical to Ms. Chandler.

2   Plaintiff points to no error in the ALJ's handling of the vocational expert testimony or in step five of the

3   disability evaluation.

4   ### CONCLUSION AND ORDER

5       For the reasons discussed above, this Court finds no error in the ALJ's analysis and that the ALJ

6   properly concluded plaintiff was not disabled during the adjudicated period. This Court further finds the

7   ALJ's decision is supported by substantial evidence in the record as a whole and based on proper legal

8   standards. This Court commends the dogged determination of plaintiff's counsel in this long running

9   case and his strong presentation of argument for plaintiff.  Nonetheless, this Court DENIES plaintiff's

10  request to award plaintiff benefits and to reverse the Commissioner's decision.  This Court DIRECTS

11  its clerk to enter judgment in favor of defendant Jo Anne B. Barnhart, Commissioner of Social Security,

12  and against plaintiff Robert C. Gomez and to close this action.

13      IT IS SO ORDERED.

14  **Dated:    March 9, 2006**          **/s/ Lawrence J. O'Neill**
    66h44d                       UNITED STATES MAGISTRATE JUDGE

15

16

17

18

19

20

21

22

23

24

25

26

27

28